819 So.2d 1034 (2002)
The ESTATE OF John Francis CRISTADORO, Through its Representative, Rebecca JONES, and John Harold Cristadoro, In His Individual Capacity, And As The Tutor of his Minor Brother, Brandon Michael Cristadoro.
v.
GOLD-KIST, INC. and James Duane Weaver.
No. 2001-CA-0026.
Court of Appeal of Louisiana, Fourth Circuit.
January 23, 2002.
Opinion on Grant of Rehearing April 17, 2002.
*1037 Timothy J. Falcon, Jeremiah A. Sprague, Falcon Law Firm, Marrero, LA, Counsel for Plaintiffs/Appellees.
Robert E. Kerrigan, Jr., Isaac H. Ryan, Deutsch, Kerrigan & Stiles, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge JOAN BERNARD ARMSTRONG, Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge DENNIS R. BAGNERIS, SR.
WALTZER, Judge.

STATEMENT OF THE CASE
On 5 March 1998, the Estate of John Francis Cristadoro, a deceased Georgia resident, through its representative, Rebecca Jones, a Georgia citizen, and John Harold Cristadoro, individually as Decedent's son and as tutor of his minor brother, filed suit against Gold-Kist, Inc., a Georgia corporation doing business in Louisiana, and James Duane Weaver of Georgia. Plaintiffs alleged damages arising from a head-on collision near Ellijay, Georgia, between a Gold-Kist truck driven by Weaver and a car driven by Decedent. John Harold Cristadoro, a Georgia domiciliary, was living in New Orleans at the time of the accident while attending the University of New Orleans. Plaintiffs and defendants requested trial by jury of all issues.
The case was removed to United States District Court for the Eastern District of Louisiana, which remanded the case to Civil District Court for the Parish of Orleans. The trial court denied defendants' exceptions of improper venue and lack of personal jurisdiction on 24 September 1998.
The parties stipulated to the Decedent's death having been caused immediately when a forklift became dislocated from Gold-Kist's truck and struck Decedent. The parties submitted the issue of damages for trial by jury in March, 2000.
Following jury trial on the merits, the trial court rendered judgment in favor of plaintiffs and against defendant Gold-Kist:
$175,000 for John F. Cristadoro's pre-impact fright, shock and mental suffering;
$683,522 for his past and future loss of income and services;
$1,641,478 for the intangible elements of his life. The trial court assessed post-judgment interest at 12% on the $2,500,000 judgment.
From that judgment, Gold-Kist appeals. We reverse.

STATEMENT OF FACTS: Juror misconduct
Trial began on 27 March 2000 with testimony by plaintiffs' expert, Tommy Wayne Sturdivan. On 28 March 2000, trial continued with testimony by plaintiffs' witnesses Timothy Ray Daniels, Martha McDowell and Elizabeth Diane Baisden, and the *1038 proffered testimony of plaintiffs' witness Elizabeth D. Baisden. At the conclusion of the proffer, the trial court interrupted the proceedings, out of the presence of the jury, to report:
During the break, a juror, who is alternate number two, Eric Pollard[1], reported to Joe Laurent, who is the Court's Crier, that he had heard some conversations about what the jurors were talking about the case. Which was, in direct violation of the order that I gave the jurors at their charge, when they first got sworn in. I called Mr. Pollard into the Courtroom, and questioned him about what it was that he heard, and who he overheard making the comments. He did not name her by name, but he said, "the juror who works at Kinko's." Her name is Della Joseph, she's juror number nine, that he had heard several comments that she had made. One of them was, that she "had already made up her mind, based on a time line." Apparently, too, she specifically made sure to tell Mr. Pollard that she had talked to her mom on the phone, but that she didn't discuss the case with her. He was under the assumption that he had made kind of a face at her, when she was talking about the case. And, perhaps it was done for that reason. And, that he overheard her tell another juror, but he wasn't sure which juror it was, something about "badgering the witness," or something like that. But, he said, that he and the young gentleman that she had made comment to, just kind of tried to walk away from the comment. He didn't hear anything else that the other juror may have said. It was his impression that she's the one doing the talking.
At that point, counsel for Gold-Kist declared his belief that a fair trial would not be possible and moved to declare a mistrial. Counsel for plaintiffs complained that a new trial would require him to bring in eight live witnesses from Georgia, and the trial judge said, "I just can't imagine that I would make you all spend the money to bring witnesses in from out of town, all over again in this case." The trial judge excused Della Joseph and replaced her with an alternate juror, Patricia Davis.
Defense counsel re-urged his motion for mistrial:
At this point, the Court, nor counsel, nor the parties, know whether this woman has talked to, in direct violation of your instructions, any other judges in this case on the jury. And, the risk being run that they have directly violate, in listening to that person's judgment on this case, the rights of my client.
The judge denied the motion for mistrial and called in juror Della Joseph. The trial judge said:
It has been reported to me that you've been discussing this case with other members of the jury. I don't know whether that's true, or not, but because there's a concern that, that has happened, and I gave very strict instructions that it not happen, I'm going to excuse you from jury service.
Ms. Joseph replied, "Okay. Thank you."
The trial judge then said, "I guess, the attorneys would like to know, if there's been anybody that did discuss it with [sic]? Any particular jurors?"
Ms. Joseph replied:
I was actually talking to a juror this morning, and I commented myself that my mother was telling me that she had served in Civil Court, and she said, you know, things that go on there, that they, you know, give them, you know, give awards to people, and stuff like that. *1039 And, I was just talking about Civiland, I said, that I commended myself, that I did not answer her.
The trial judge asked, "Okay. Do you know what juror it was that you talked to?" Ms. Joseph replied, "I said it right he could hear it. I said it in front of everybody. Oh, you didn't hear it?" The judge asked, "It wasn't just one juror in particular?" Ms. Joseph replied, "No, unun."
Defense counsel was allowed to ask Ms. Joseph, "Ms. Joseph, other than talking to Eric Pollard, and telling him that you've already decided the case. Did you tell any other juror that?" Ms. Joseph asked counsel to identify Mr. Pollard, and replied, "I did say some things."
The following colloquy ensued:
THE COURT: Were there any comments made about you made up your mind already? What you were going to do?
MS. JOSEPH: It might have been thought of like that, but I didn't mean it. I just said, thatabout the personality of someone.
DEFENSE COUNSEL (Mr. Kerrigan): Who?
MS. JOSEPH: Mr. Cristadoro.
DEFENSE COUNSEL (Mr. Kerrigan): The personality of Mr. Cristadoro?
MS. JOSEPH: Un-huh. (affirmative response)
DEFENSE COUNSEL (Mr. Kerrigan): You talked with the other panel about this? The other panel members?
MS. JOSEPH: No. Actually, the one with the curly hair ... We were talking but I feltwe both felt like we shouldn't discuss it. So, he walked off.
THE COURT: So, you made a comment to him, and he just walked off?
MS. JOSEPH: No, we were actually engaged in a conversation.
THE COURT: ... I'm trying to find out who you talked to, and what you talked to them about.
MS. JOSEPH: Okay. There was himhim, and Ben Euro (phonetic) talking out in the hall. But, I can't remember we said something about the lady, you know the lady with thethat had on the suit, and she had the little bang? You know, how she reacted, strongly. All of us discussed that. But, we didn't think it would have anything to do with it. We just felt that she got uncomfortable. But I didn't bring it up.
Following this questioning, the juror was told to leave the courtroom and the trial judge said, "Now, I got [sic] a problem. They're all sitting there talking about witnesses and how they're reacting." Despite that reaction, the trial judge merely excused Ms. Joseph. Defense counsel objected, noting, "Well, Judge, we don't know how many of the jurors were possibly tainted." The trial judge admitted, "Well, I don't know that they're tainted, or not. I just don't imagine that they are tainted." The jury re-entered and the judge instructed the jurors again admonishing them not to talk about the case with anyone or with other jurors until instructed to do so. She told the jurors:
You all will remember, at the very beginning when I gave y'all instructions. I told you, you were not to discuss this case, either amongst yourselves, or with anyone else, nor should you permit it to be discussed in your presence. Because, it was reported to me that one of the jurors was discussing the case, I have excused her from jury service. Of course, we are concerned that there were discussions among others of you about this case...."
Despite this additional recognition on the record, this time in front of the jury, of possible general misconduct among the jurors, *1040 the trial judge did not interview the jurors individually in order to ascertain the nature and extent of the improper discussions.
The next morning, on 29 March 2000, following testimony by Brandon Cristadoro, Gold-Kist again moved for mistrial based on the jury misconduct outlined above and other alleged misconduct, and requesting a hearing wherein the court could determine whether other jurors had participated in the misconduct admitted to by Ms. Joseph and Mr. Pollard. The trial court denied that motion without giving reasons.
Following the testimony of Decedent's mother-in-law, defense counsel again urged his request that a mistrial be declared:
I have also to report, that on several occasions, we've had [plaintiffs'] witnesses sitting in the hallway talking with either [plaintiffs'] counsel or themselves around jurors. I've made that observation, and I hope that, that will not continue. Secondly, this morning Mr. Clark, who was to read the deposition of one of the witness [sic], today, who I understand worked in Mr. Falcon's office, was talking with one of the ... was talking to one of the jurors coming off theat a recess.... The sole purpose of this is to stop any contact between counsel, employees, witnesses, and the jury.
Plaintiffs' counsel denied that such contact had taken place, but admitted to contact between Clark and a juror. The trial judge did not examine either Clark or the juror, and denied the motion for mistrial.

STATEMENT OF FACTS: Damages
State Trooper Tommy Wayne Sturdivan testified for plaintiff as an expert. The trial judge did not specify the area of Sturdivan's expertise. He testified that Georgia State Patrol chose him to serve as lead investigator of the fatal collision because of his seniority and because he had previously taken an accident reconstruction class. He examined the vehicles the day after the collision, and, on the following day, visited the scene. Based on his examination, Sturdivan testified that the collision occurred when the Gold-Kist rig was traveling west on Georgia Highway 282. Tire and gouge marks showed the rig traveled across the eastbound lanes and over to the shoulder area, where hydraulic fluid had spilled on the grass. This was the area of impact of the Hyster forklift truck from the Gold-Kist rig with Decedent's Honda. Sturdivan opined that Decedent saw something coming towards him, whether it was sparks or the tractor and trailer, and went off the roadway. Decedent was completely off the roadway, 4.8 feet from the fog line, when he was struck. Sturdivan outlined the physical evidence on which he based his conclusions. The gouge marks showed that the trailer was on its side, bounding across the eastbound lanes, as the forklift came off. Sturdivan concluded that Decedent would have been able to see the truck and forklift prior to the collision, and by natural reaction drove away from it towards the guard rail. After the guard rail, there was nowhere for Decedent to go. Based upon a line drawing showing the positions of the vehicles and lines of travel, together with estimates of the vehicles' speeds, Sturdivan concluded that 5.6 to 6 seconds elapsed from the time the rig crossed the yellow line until the impact with Decedent's Honda. Decedent's vision would have been limited to the rig's headlights, since the accident occurred in the dark of night, close to midnight. On cross-examination, Sturdivan admitted that Decedent would not have noticed the rig crossing the yellow line until it was 300 feet distant, and that the closing time between that first notice of the rig travelling at 75 miles per hour and the Honda travelling at 45 miles *1041 per hour and the collision which immediately took his life was no more than one and one-half seconds.
Sturdivan's opinion that Decedent took evasive action was contradicted by the report of plaintiff's engineer, Dr. Luther 0. Cox, Jr., which concluded that the fork-lift came off and struck the Honda on the highway, not off the highway. As a result of the impact, it pushed the Honda into the guard rail. When confronted with the fact that the fork-lift had hit the Honda headon, which would be unlikely under Sturdivan's reconstruction that placed the Honda turning from the highway onto the grass at the time of impact, Sturdivan testified that once the Honda went off the roadway, Decedent was somehow able to straighten out the vehicle, all within the 1.5 second time span. Nonetheless, the jury apparently accepted this testimony as credible since it rendered a verdict for a very substantial amount of pre-impact mental damage.
Cox, an expert engineer who had been retained by plaintiffs' counsel, testified by deposition taken 11 January 1999. Cox met with plaintiffs' attorneys in September, 1997, and went to Ellijay to investigate the accident. He walked through the scene of the collision and inspected the vehicles, and returned to the scene, accompanied by plaintiffs' attorneys, Mr. Falcon, Mr. Sprague and Mr. Kiser. Cox reviewed the original police report and a follow-up report by a special investigation team. He opined that the circumstances of the incident would not indicate that the Decedent had time to do any type of maneuvering prior to impact, nor did he see where there were any physical markings or support for the evasive maneuver onto the shoulder of the highway as described by the State Trooper. Cox testified that the impact occurred when the Honda was in the proper lane of travel, proceeding in the direction in which it had been going. There was no evidence of any dirt or other substance consistent with the Honda's being off the right-hand side of the road on the shoulder. There was nothing in the damage pattern on the Honda to suggest that the Decedent had made any maneuver in recognition of the impending collision. According to Cox, only one and one quarter seconds could have elapsed between the time the fork lift began to come off and the collision. The oncoming Honda operator could not have perceived and reacted to avoid the fork lift.
Timothy Ray Daniels, an exterminator living in the Ellijay area who was a friend of the Decedent, testified for plaintiff. He described Decedent's work habits, noting that he was trying to find something he liked. When he got out of the armed services, he worked for eight months or more at the Johnson Volvo dealership as a technician, quit and then went to work driving trucks for Penske. He worked in a carpet mill in Dalton, Georgia, for a longer time. Decedent worked night shift, which paid more than day shift, at the plant six days a week when he could. Daniels testified, "Everything he could do to earn money, he did it." Daniels said that whenever Decedent missed work, it was because of illness. Daniels testified that he went hunting, camping and motor-cycling with Decedent, but that neither of Decedent's sons ever accompanied them. Under cross-examination, Daniels testified that Decedent never received a government grant to set up his own skating rink business, and was never told that Decedent received a grant from the State of Georgia to take a computer course.
Martha Gracie McDowell, another of Decedent's friends from Ellijay, described him as a kind, soft-hearted person who attended his sons' athletic events.
Elizabeth Diane Baisden of Eaton, Georgia, testified that she worked with Decedent *1042 at the Shaw Industries Plant # 83, a carpet mill. He began working there in April, 1996. She described Decedent as very dependable and reliable, and as a person who was well respected by his co-workers, and denied that he had ever been put on probation by Shaw. Ms. Baisden recalled that he was taking computer courses, but did not recall his having told her that he failed three of the courses.
Miriam J. Young of Baton Rouge testified that she was the mother of Decedent's late wife, who died in 1995. Her grandson, John H. Cristadoro, came to live with her in New Orleans when he attended the University of New Orleans. She described the Decedent as an easygoing person and a hard worker who cooked a lot, did yard work and anything he was asked to do around the house including keeping his sons. She corroborated earlier testimony that he enjoyed attending his sons' athletic events.
In April, 1994, Decedent's wife was ill and moved to her mother's home, then in New Orleans. After Decedent's death, his son, Brandon, moved in with Mrs. Young. She testified that she treated her grandsons and son-in-law as if they were her own, paying their tuitions, buying them cars, purchasing their home and adjoining acreage in Georgia and taking them on vacation.
Craig L. Boetler, a contract computer programmer from Jasper, Georgia, testified that he taught a microcomputer specialty course from 1 March 1997 to 15 August 1998 at Pickens Technical Institute, a two-year community college offering technical vocational courses. Although he was only an instructor and not a placement officer at Pickens, he was allowed to testify concerning salary ranges for persons who successfully complete the microcomputer specialist course. He described his "expertise" in salary ranges:
Q: How did you come about getting that knowledge?
Boetler: Hours and hours of looking in want ads.... Part of my job would be for a student after the fifth quarter, or a student was graduating, we'd try to place that student. And, I would, as part of my job, would be to look and see what was available out there and advise that student as to what they could expect, and how much money they could expect to be making, or where they would have to go to make that money.
Boetler testified that he gave this advice to students from 1 March 1997 to 15 April 1998. He also said that he had friends with whom he would talk about the market. He had no knowledge about the job market in Ellijay, but testified to the market in Atlanta, which is located 75 miles from Ellijay. The trial court allowed Boetler to testify that entry level jobs in Atlanta offered between $22,000 and $25,000 annual salary. Work as a network supervisor or website designer, or in desktop publishing graphics would command between $27,000 and $30,000 per year.
Boetler testified that he taught the Decedent Programming Design and Development. He went through Decedent's school record, noting that for the first six months or so, when he took remedial general reading, math and English, his work was satisfactory. He received "B" in introduction to computers and operating systems concepts. The next quarter, he "withdrew passing" from a keyboard typing class, and a "C" with "Academic Warning" in business math. Decedent fell behind during the next quarter, when Boetler taught him Program Design and Development, because of working long hours at his job. He then received three "F's" for that quarter.
On cross-examination, Boetler admitted that Decedent had received a state grant *1043 to study at Pickens, but never completed the course of study and had failed the last three courses he had taken prior to his death. He also admitted that Mrs. Poole was Pickens' placement officer, and it was her job to try to find jobs for Pickens' graduates. She never would have had the opportunity to evaluate Decedent's job prospects.
On re-direct examination, plaintiffs' counsel asked Boetler, "Is it also true that the only reason, for certain, why Mr. Cristadoro [never completed the courses or was interviewed by prospective employers] was because he was killed on August 7, 1997, by the Gold-Kist fork-lift, isn't that true?" Defense counsel's objection was sustained, and he moved for mistrial. The trial judge denied the motion.
Defense witness Jeffrey E. Carlisle testified as an expert in the field of vocational rehabilitation, including job analysis and job placement. Carlisle testified that he had previously done work for individual clients of plaintiff counsel under the vocational rehabilitation act and workers' compensation laws, and one of Carlisle's associates works directly for plaintiff counsel's law partner.
Carlisle reviewed Decedent's personnel records from Shaw Industries, Aladdin Mills, Johnson Volkswagen/Volvo, Avondale Shipyards, the United States Marine Corps, and the United States Army; school record from Pickens and Jefferson Parish public schools; analysis of Decedent's military service prepared by Major Roderick of the Army's Judge Advocate General's Office; and the depositions of Ms. Shirley Poole, the Pickens director of recruitment and placement, and of Boetler.
From the records, Carlisle found Decedent withdrew from high school in the ninth grade. He enlisted in the Marine Corps in 1971, and served in the Philippines, where he was twice disciplined for leaving his post and for sleeping away from his post. He was honorably discharged several years later and in about 1976 enrolled in Delgado Community College in New Orleans, where he was placed on academic suspension. In September, 1978, he went to work as a tack welder for Avondale, and was terminated in October, 1979, after having received various warnings for tardiness, or reporting late to his shift. In 1980, he received a GED from East Jefferson's school system and enlisted in the Army. Military records indicate that he received medals and was promoted through Sergeant E 6, that is, Staff Sergeant, although he had been demoted as well for an incident that occurred while he was in Germany. He was honorably discharged at Fort Benning, Georgia, was not considered eligible for reenlistment, and moved to Ellijay, Georgia in 1992.
Decedent worked for the Volvo dealer for about three months and went to work at Aladdin Mills as a material handler for three years. He was terminated by Aladdin for excessive absences or tardiness. On cross-examination, Carlisle noted an employment record noting poor attendance, good/satisfactory work, and the note, "personal problems, wife passed away during childbirth. Attendance was poor during that time. Tried to work with him." All other ratings are "very good" and he was not considered eligible for rehire.
Six weeks later, Decedent went to work for Shaw Industries as a creeler and a tufter machine operator and was placed on probation for several instances of unexcused absence or tardiness. He worked at Shaw until the accident.
Carlisle's review of Decedent's academic record and the Boetler and Poole depositions showed that out of approximately five quarters at Pickens, two were spent taking remedial courses, so those credits did not apply towards his degree. Of the three *1044 remaining quarters at Pickens, the highest grade he received was a "B", but in the last quarter, he received failing grades in the subjects that would be related directly to computer application. Decedent had been placed on academic probation and received a final notice of probation in spring, 1997. The records do not show Decedent as having attended school in fall of 1997. After the final quarter, his grade point average was 1.42.
Carlisle concluded that Decedent did not have the skills to work in the computer field. His skills were developed in the military and fitted him for a civilian job establishing lines for communications, radio systems, or walkie-talkies. He could also work as a mechanic or a tack welder, material handler or creeler/tufter machine operator in a carpet mill, unskilled or semi-skilled employment requiring average intelligence, math, reading and language skills. In Carlisle's opinion, it would have taken anywhere from several months to two years to complete the computer course he had attempted. Carlisle testified that the computer industry is highly competitive, and many young people are trying to get into the field.
Carlisle concluded that Decedent would not have been successful at completing the computer course and would not have been able to secure employment as a microcomputer specialist. Based upon the records available for his review, he felt Decedent was employed to his logical capacity at the time of the accident, when he was earning $9.38 per hour. Carlisle testified that an opinion that it was possible that Decedent would have a position in the microcomputer industry would be based on speculations and assumptions that have no basis, and not on the evidence in this case.
Certified Public Accountant John Theriot testified as plaintiffs' economist. According to Theriot, Decedent had a life expectancy on the day he died of thirty-one years and a work life expectancy of 16.9 years. Theriot calculated wage loss based on $19,150 annual income to be $90,918 for past loss and $822,814 future wage loss. Using the highest inflation calculation, the total wage loss was $913,732, and using the lowest inflation calculation, the total wage loss was $683,522. He calculated past loss of fringe benefits to be $9,263, and future loss of fringe benefits to be between $49,911 and $63,401. He calculated the value of lost household services to be $203,000.
He calculated lost earnings for data processing equipment repairers, the goal of Decedent's education at Pickens, based on an annual wage of $29,340. Theriot "grew" this figure based on 3% inflation to January of 2000 when, under the best of circumstances, Decedent could have sought such employment. The losses Theriot calculated under this scenario were $95,318 (past) and between $843,880 and $1,142,007 (future). On cross-examination, Theriot admitted he had no independent knowledge of Decedent's work history or educational background. He also admitted that if the older son were living in New Orleans while attending the University of New Orleans, and the younger son moved to live with his grandmother, there would be no loss of household services occasioned by Decedent's death. Theriot admitted he had no knowledge of Decedent's capabilities to do any future job and had no experience or expert qualifications in vocational job placements. He also admitted that the factor he used to determine fringe benefits was not based on any actual information concerned the level of fringe benefits Decedent had earned or would be expected to earn in the future.
Dr. Kenneth J. Boudreaux was accepted as an expert economist and testified for the defense. He noted that Georgia law requires him, in calculating future earnings, *1045 to reduce the amount to its present value on the basis of interest calculated at 5% per year. Dr. Boudreaux testified that between the accident date and the trial date, at the hourly wage rate of $9.38, increased by three percent, lost earnings amounted to $20,378 a year. He added 17.23% reflecting fringe benefits of medical coverage, insurance and a 401K plan and calculated past lost earnings to be $56,781.
Based on the assumption that Decedent worked around the house for three hours a day, seven days a week, he calculated the value of past lost services to be $17,836. According to U.S. Bureau of Labor Statistics work life tables, Decedent had an expected work life of 16.4 years. Using the statutory 5% discount rate, and projecting Decedent's wage would have increased between two and four percent per year, the present value of future lost income would be $227,587 at two percent; $241,470.25 at three percent, or $255,352 at four percent.
Dr. Boudreaux rejected Theriot's assumption that Decedent would have a computer job at over $33,000 annual salary. Dr. Boudreaux testified:
[T]here are reasonable rigorous conditions and standards that an economist, in my view, has to maintain with respect to estimating an income base, or how much money a person would have earned. Typically, what we use is records of how much they actually have earned over a period of time. Absent that, we're able to use testimony, for example, of an employer of that individual, who says, "This person would have earned this particular amount of money for my company," and was an employee of that company. Absent that, what an economist has to rely on is the testimony of other experts, with respect to their opinions, about what that person's capability of earnings income is. Economist [sic] don't have any training or expertise to discover, or invest, or create, wage bases for people, unless they've actually earned that amount.
Dr. Boudreaux criticized Theriot's assumption that loss of household services would continue throughout Decedent's life expectancy, long after John and Brandon would be expected to have left the family home in Ellijay.
As to future household services, Dr. Boudreaux determined that the services would have been provided through the youngest child's eighteenth birthday, which has already past. Therefore, he reduced the value of the future loss of household services through Brandon's twenty-first birthday to be $6 per hour for three hours a day, seven days a week. Discounted to present value, $18,116 would be required to provide that level of service until Brandon attained the age of twenty-one.
Dr. Boudreaux's final calculation, using the midpoint of projected wage increases, for total economic loss was $334,205.
John H. Cristadoro, Decedent's son, testified concerning his relationship with his late father. John was born on 12 December 1977. He testified that his mother died on 27 April 1995, and both his parents are dead. He was 19 when his father died in 1997. He presently lives alone while attending the University of New Orleans. John has served in the Air Force National Guard since 1998. He described the Cristadoros as a close-knit family, given the circumstances of his father's military life. His father loved their life in Ellijay. According to John, his mother "wore the pants in the family" and his father was "compliant". John testified that he did not keep in touch with his only remaining Cristadoro relatives, an uncle and his family who live in Houston. According to John, his father liked simplicity, and did not have any enemies. He felt he could talk to his father about anything and did on several *1046 occasions. The children were the Decedent's top priority; he attended their games and functions. They "hung out" together, and played video games. John described his parents' relationship with each other as "unique." He described his mother as "a physical woman. So, I mean, she'd threaten him, but you know, she never did do anything. Because, he would know, he would know, he would just stand there and say, `Okay, Becky, okay,' and go along with it." John also described the various jobs his father had after his separation from the military. Decedent stopped working for Penske, driving trucks between Georgia and New York, because the job took him away from his home and family. Decedent was always trying to provide for his family. Decedent also had responsibilities with respect to John's younger brother, Brandon. He would try to get as much overtime as possible, and to fit this in with the children's games and other, unspecified activities.
John testified that when he studied at the University of New Orleans, he and his father talked often, and Decedent wanted him to transfer to a nearby Georgia college. He also discussed his break-up with his high school girlfriend with his father. John testified that his father was hard on his sons with respect to their schooling, because he realized the importance of education, but he was not unfair or harsh. John also identified a number of family photographs. We are unable to determine from the cold record the nuances of expression, voice or body language that would have been further evidence of the depth of John's relationship with his father.
During cross-examination, John testified that he held several jobs, but did not have to contribute to the household. He and his brother own the Ellijay home and rent it to a tenant. John's education in Louisiana is tuition-free because of his Air Force Reserve program.
Decedent's son, Brandon Michael Cristadoro, testified that he was born on 2 March 1982. His father taught him to ride a bicycle and taught him to tie his shoes. He testified that he and his father were always close, because he was the younger child. They would go off together on father-son activities. He toured Germany with his family when his father was stationed abroad. He testified that his father always cut the grass at their Georgia home and was "real nit-picky about stuff around the house. You know, a candy wrapper on the floor, he would go irate, and we would get grounded. We wouldn't necessarily get grounded, but he would say he grounded us and we would get off in a couple of hours. But, he was real, real picky about little stuff like that. He always wantedhe wanted everything that he had to be perfect, I guess." Brandon testified that his father taught him to chop wood and use a weed-eater. Decedent mopped the floor and did laundry, although his wife did not like him to do the laundry because he did not know how to do so.
Brandon testified that when John went to college in New Orleans, Brandon and his father "became inseparable ....when I lost my father, I lost my father, but I lost a real good friend. A real, real, real close friend." Brandon described the time when his father went back to school, as Brandon was starting high school: "It was rough. But, leave it up to my dad to make a way for his children, no matter what it was....[I]t could be a hurricane and my dad would always find out some way to be with his child."
At that point, the trial judge instructed the jury:
Under Georgia law, you don't consider the loss to the children for how they feel *1047 about having lost their father. It's different under Louisiana law. So, I'm going to be real strict about this, I'm not going to allow any testimony about how difficult it was. I think we all know that it was difficult to lose their dad. But, I'm not going to allow any testimony on it, because under Georgia law, that is not a measure of compensation.
Brandon characterized as "rough" the time during spring of 1997 when his father's lady friend, Barbara (no last name given), was living in the family's home in Ellijay. Brandon also identified a series of family photographs. In describing his relationship with his father, Brandon testified:
[M]y dad was my teddy bear, basically, somebody that you could talk to. If I would have killed the President, or, you know, done any crime, no matter what it was. If I would have ate [sic] people, it doesn't matter, I could have asked my dad, and he would have given me an honest opinion, just like a regular human being. My dad was my God."
Under cross-examination, Brandon was asked about problems and difficulties his father had at work or in the service, and he replied:
So what, if he was having difficulties. Everybody has difficulties, but I'm sure if they were severe, my brother or I would have heard some sort of information about it.
After Brandon's testimony, defense counsel again moved for a mistrial based on the juror problems, inflammatory comments by plaintiff counsel to Boetler, and improper questioning of Brandon by plaintiff counsel that was contrary to Georgia law on damages. The trial judge denied the motion without comment. The motions were re-urged at the conclusion of the case for the defense.
The trial judge gave the following jury instruction on damages under the applicable Georgia law:
Damages are given as pay or compensation for injury done. Where the law requires one party to pay damages to another, it seeks to see that the damages awarded are fair to both parties. If you believe from a preponderance of the evidence that plaintiff is [sic] entitled to recover, you should award to the plaintiff [sic] such sums as you believe are reasonable and just in this case.
Ladies and gentlemen of the jury, I charge you that it is the plaintiff's burden to present any evidence as to damages, including damages for lost wages, with a reasonable degree of certainty. Calculation of the amount of damages sustained, cannot be left to speculation, conjecture, or guesswork. Therefore, I must charge you that in determining whether or not the plaintiff [sic] is entitled to damages, you are not permitted to guess or speculate as to any item claimed.
If you find that the decedent experienced conscious pain and suffering prior to death as a result of defendant's conduct, then you may award damages in an amount which would have fairly compensated the deceased for such pain and suffering experienced from the time of his injury until his death.
Where the medical evidence is that death was instantaneous, and there is no evidence the decedent exhibits consciousness of pain, recovery for the decedent's pain and suffering is not permitted.
The full value of the life of the deceased, as shown by the evidence, is the full value of the life of the deceased without deduction for necessary or other personal expenses of the deceased if he had lived. The full value of the life is *1048 not limited to the amount of money John Cristadoro could have or would have earned if he had not been killed. There are two elements which make up the full value of the life.
The first of the two elements which constitutes the full value of the life of John Cristadoro is the non-economic or intangible element. The full value of the life of the decedent is not determined solely from their lifetime earnings, earning capacity, or services that have an economically determinable value. In attempting to arrive at the full value of the life of the decedent, you as jurors, in the light of your own observation and experience, are authorized to take into consideration the value of these intangible elements which are not capable of exact proof. The intangible value of the life to which I have referred includes the value of John F. Cristadoro being alive and being able to enjoy life and living. These intangible elements also include John Cristadoro's relationship with his family and friends, which he lost by death. The society, advise, counsel and companionship with his family and friends are also part of the full value of the life of the decedent to be compensated fully by the jury. The measure of such loss is the enlightened conscience of you fair and impartial jurors.
The second of the two elements which constitutes the full value of the life of the decedent is the economic value of his life. You may take into consideration evidence of the deceased's earning capacity, intelligence, education, motivation, habits, age, health and physical condition.
The full value of the life of the deceased, as shown by the evidence, is the full value of the life of the deceased without deduction for necessary or other personal expenses of the deceased if he had lived. You should consider the gross sum the deceased would have earned to the end of his life, had he not been killed, reduced to its present cash value, in determining the amount of the full value of the life of the deceased. The full value of the life of the deceased is not limited to the amount of money he could have or would have earned had he not been killed.
In reducing this sum to present cash value you would use the legal rate of interest which is five-percent. You may make the calculation in reducing this sum to its present cash value by any correct method satisfactory to you. The object of the law is to give such a sum as, put out at interest at five-percent, and exhausting apart [sic] of the principal each year, would produce each year what you find would be the value of the decedent's yearly services, and the entire sum would be exhausted at the end of the decedent's life expectance as you find it to be. In other words, the amount found, with the addition of five-percent legal interest, would accomplish exactly such payments each year throughout the decedent's life expectancy as you may find the decedent's services would have been worth each year during that expectancy and would be exhausted at the end of his life expectance. You, yourselves, may arrive at the expectancy of the deceased under the testimony of this case without any use of mortality tables at all, and you may make the calculation reducing it to its present cash value by any correct method of calculation satisfactory to you. In determining the value of the services of the decedent, you may consider all the facts and circumstances of the case. You may consider his age at the time of his death, and the fact that a person rarely labors every day until his death or receives all the while a fixed income from his labor, nor does his capacity to earn money often remain undiminished *1049 to old age. In arriving at the amount to be allowed as damages, all these things should be borne in mindFeebleness of health, actual sickness, loss of employment, voluntarily abstaining from work, dullness in business, reduction in wages, the increasing infirmities of age with corresponding diminution in earning capacity, and other causes which may contribute in greater or less degree to decrease the gross earnings of a lifetime. Proper consideration should be given to all these items in considering diminution in income from labor, or in considering the value of services in a lifetime. You, as the trier of fact, can decide whether or not to use inflation as a consideration.
In this phase of the trial, punitive damages are not allowed and you should not, by your award, seek to punish the defendant. In assessing damages, you should seek only to reasonably compensate the plaintiffs.
Remember, you are NOT to consider in making your award either the loss of love and affection suffered by Mr. Cristadoro's sons or the fact that Mrs. Cristadoro passed away.
FIRST ASSIGNMENT OF ERROR: The trial court erred in failing to order a mistrial or, alternatively, a hearing on the record in response to defendant's motion for mistrial.
It is well established in our law that a motion for a mistrial in a civil case should be granted under the following circumstances: (1) when the trial judge determines that it is impossible to reach a proper judgment because of some error or irregularity and (2) where no other remedy would provide relief to the moving party. Gable v. Verrett, 628 So.2d 146, 147 (La. App. 4 Cir.1993), citing Spencer v. Children's Hospital, 432 So.2d 823 (La.1983). Motions for mistrial should also be granted upon proof of prejudicial misconduct occurring during a jury trial which cannot be cured by admonition or instructions to the jury. Id.; Coleman v. Deno, 99-2998 p. 13 (La.App. 4 Cir. 4/25/2001), 787 So.2d 446, 459-60. A trial court is granted great discretion in determining whether to grant a mistrial, since mistrials are not a matter of right. Searle v. Travelers Ins. Co., 557 So.2d 321, 323, (La.App. 4 Cir. 1990), citing 76 Am.Jur.2d, Trial Sec. 1072. The conduct of the trial is within the discretion of the trial court, and that discretion is subject to review only for abuse of that discretion. Barre v. Bonds, 99-1806 p. 23 (La.App. 4 Cir. 5/10/2000), 763 So.2d 60, 73, citing LSA-C.C.P. art. 1631. Generally, courts have accepted that a mistrial is a dramatic remedy; therefore, if no other remedy is available for the factfinder to consider in reaching an appropriate verdict, then a mistrial would be proper.
In the Gable case, the issue was whether the conversation of a single juror with a witness was grounds for mistrial. In that case, the trial court interrogated the juror and concluded that the conversation was irrelevant (a request by the witness to the juror to carve a gun stock for him and the juror's refusal) there was no basis for mistrial. In that case, the interrogation of the juror established the extent of possible prejudice.
In the Searle case, the trial judge allowed counsel to make a complete record. During a break in the trial, a secretary for plaintiff counsel was asked by one of the jurors how long the trial was going to take. The secretary said she did not know. Defense counsel admitted that the conduct was innocuous, but claimed that it showed the jurors were comfortable talking to someone associated with the plaintiff. The trial judge took the motion for mistrial under submission and at the conclusion of the trial, after the jury returned its verdict, he questioned all the jurors allegedly involved in the incident. The three jurors *1050 all testified that they were not sure that they remembered any conversation with the secretary and affirmed that there was "no discussion in any way, shape or form about this case." On the basis of that record, the trial judge denied the mistrial motion and this Court affirmed.
In the instant case, the trial judge admitted she was unable to determine whether, in fact, the other jurors had been tainted by the conversation in which Joseph and Pollard engaged. She recognized that the conversation took place, in Ms. Joseph's words, in front of everybody. Nonetheless, unlike the trial judge in the Searle case, the judge refused to hold a hearing at which the jurors could have been examined individually to determine the nature and extent of the misconduct. Under the circumstances of this case, where a juror has admitted having discussed the case in front of all the other jurors such a hearing is necessary in order to determine which jurors should be excused; whether the parties' right to a fair trial by an unbiased jury could be honored by the remaining jurors; and, ultimately, whether a new trial would be required. This admission defeats any contention that the jury misconduct was not prejudicial. Neither the trial judge, nor the parties, nor this Court can know without a record of testimony from the entire jury panel whether that jury had been so tainted that defendants' right to trial by a fair and impartial jury was denied in this case.
We are not persuaded by plaintiffs' objection to incurring the additional costs of bringing their eight witnesses from Georgia. Plaintiffs sought venue in Orleans Parish knowing that its witnesses were located in Georgia and that Georgia law would apply, thus requiring all parties to engage Georgia counsel in addition to local trial counsel. Plaintiffs vigorously and successfully resisted defense exceptions to jurisdiction and venue in Orleans Parish. When a party makes a venue choice, it should anticipate the costs and risks associated with that choice. Surely the possibility of a mistrial is one of those foreseeable risks.
This assignment of error has merit. In the interest of justice, and in light of the trial judge's statement that she was unable to determine if the jury was tainted, and has serious concerns about the effect of the conversation on the jury panel, we reverse the judgment rendered on 15 May 2000. Appellants' remaining assignments of error, relating to the jury's findings, are moot.
Generally, where a jury verdict is tainted due to a material error at trial, making it untrustworthy, then the verdict must be overturned; however, when an otherwise complete trial record exists, the general rule is that an appellate court should, if it can, render judgment on the record. Jones v. Black, 95-2530 (La.6/28/96), 676 So.2d 1067, citing Gonzales v. Xerox, 320 So.2d 163, 165 (La. 1975). See also, Lawson v. Straus, 98-2096, p. 6 (La.App. 4 Cir. 12/8/99), 750 So.2d 234, 239. Only when a view of the witnesses is essential to a fair resolution of conflicting evidence should the case be remanded for a new trial. Jones v. Black, at p. 1, 676 So.2d at 1067, citing Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980). See also, Wilson v. PNS Stores, Inc., 98-1004, p. 14 (La.App. 4 Cir. 12/16/98), 725 So.2d 66, 73-74, where the case was remanded for a new trial because the credibility of the witnesses was found to be of critical importance. "With the conflicting testimony ... [on a pivotal issue] this court finds it impossible to measure the effects of the trial court's persistent focus on [defendant's] apparent deviation from written policy excerpts." Because the employment discrimination claim at issue in the Wilson *1051 case turned upon proof by indirect evidence and by the inferences derived from the conflicting testimony of the parties, a remand for a new trial is required in the interest of justice.
We conclude that although a view of the witnesses is always helpful in determining the facts of a case, it is not essential to a fair resolution of the conflicting evidence.
This Court requested further briefing by counsel for the parties of whether the case should be reviewed de novo or remanded for a new trial on the merits. While the parties differ as to whether the trial judge committed prejudicial error in denying the Gold-Kist motions for mistrial, they agree that the record is complete and there is no need to remand the case for a new trial on the merits. Our independent consideration of the issue leads us to agree with the parties that a jury re-trial is not necessary to a fair and just resolution of this case. In the interest of judicial economy, we have reviewed the entire record de novo.

De novo review
We conclude that the plaintiffs failed to prove by a preponderance of the evidence that Decedent could have been aware of his plight for more than a split second prior to the impact with the forklift that the parties stipulate killed him immediately. The testimony of engineer Luther O. Cox, Jr. who was retained by plaintiff, clearly establishes that there was no evidence that Decedent had sufficient opportunity to take evasive action of any kind. Trooper Sturdivan's contrary testimony is less credible. He lacks the training and experience of engineer Cox, and admitted that the elapsed time between the point at which Decedent could have noticed the danger to the time of his death was at most one and one-half seconds. Since the credible evidence does not preponderate that Decedent suffered pre-impact anxiety in any measurable degree, we do not award such damages.
We have reviewed the testimonies of accountant Theriot and economist Dr. Boudreaux, and find the economist to have provided more trustworthy data. The evidence plaintiffs offered to support their entitlement to lost wages based on Decedent's potential future employment in the computer industry is insufficient to satisfy their burden of proving lost wages by a preponderance of the evidence. While the evidence clearly shows that Decedent was diligent and hard-working, it is likewise clear that he was failing his computer course at the time of his death, and there is no credible evidence that he would have been able to graduate from the Pickens program or obtain a job at the wage used by Theriot in making his calculations. We accept Dr. Boudreaux's calculation of past and future lost earnings. We reject Theriot's assumption that plaintiffs had a claim for loss of Decedent's household services throughout his life expectancy. We accept Dr. Boudreaux's calculation of future loss to Brandon through age twenty-one, of $18,116. Since John was not living at home at the time of Decedent's death, and did not testify that he would return to live with his father prior to the age of twenty-one, he did not incur damage for loss of household services. We accept Dr. Boudreaux's assessment of $334,205, total economic loss.
While Georgia law provides for recovery of the Decedent's loss of intangible relationships, society, advice, companionship and counsel, it does not allow for recovery by plaintiffs for their own loss of these items of damage. The amount of the full value of life is entirely within the purview of the finder of fact, and should be determined upon consideration of the monetary value of Decedent's services and the value of services rendered which are not *1052 capable of exact proof. Calloway v. Rossman, 150 Ga.App. 381, 257 S.E.2d 913 (Ga.App.1979). The intangible factors which supplement the economic value to comprise the full value of the Decedent's life elude precise definition, particularly in situations such as the instant one in which the Decedent was employed and thus a basis exists for determining the loss. Miller v. Jenkins, 201 Ga.App. 825, 412 S.E.2d 555 (Ga.App.1991). In that case, parents recovered $108,868 total economic and intangible damages for the wrongful death of their employed 23 year old son.
We have reviewed the testimony concerning the character and family circumstances of Decedent, and his relationship to his two sons. In considering this evidence, in light of our own experience as trier of fact de novo, and our knowledge of human affairs, we are governed by our enlightened conscience. Consolidated Freightways Corporation of Delaware v. Futrell, 201 Ga.App. 233, 410 S.E.2d 751 (Ga.App.1991). In that case, a husband and wife died in a collision with defendant's truck. The opinion furnishes no detail concerning the plaintiffs, but it does note that the husband had one minor child and the wife left "minor children." The appellate court affirmed jury verdicts awarding $1,000,000 for the intangible component of the wife's life, and $800,000 for the intangible component of the husband's life.
Viewed from the Decedent's perspective, a reasonable award based on his own loss of the companionship of his children and the intangible elements of his life is $750,000.
For the foregoing reasons, we reverse the judgment of the trial court and render judgment in favor of plaintiffs in the amount of $334,205 economic loss and $750,000 intangible loss, for a total judgment of $1,084,205, plus legal interest as provided by law. Costs of this appeal are assessed against the appellees.
REVERSED AND RENDERED.
ARMSTRONG J., Concurs in the result.
MURRAY, J., CONCURS in the result for the reasons as assigned by J. ARMSTRONG.
BAGNERIS, J., Dissents with reasons.
ARMSTRONG, J., concurring in the result.
I do not believe that the trial court abused its discretion in denying the motion for a mistrial. I do believe, however, and for much the same reasons given by the majority opinion as to the quantum of damages, that the jury was clearly-wrong manifestly erroneous as to the special damages and abused its discretion as to the general damages. The damages awarded by the majority are the most the jury could have properly awarded. Accordingly, I concur in the result.
BAGNERIS J., dissenting.
I respectfully dissent from the majority opinion, and I would affirm the judgment of the trial court. I respectfully agree with the position of J. Armstrong that the trial court did not abuse its discretion in denying the motion for a mistrial. However, as it relates to quantum of damages, special damages and general damages I dissent.
Prior report: 819 So.2d 1034.

(ON APPLICATION FOR REHEARING)
MIRIAM G. WALTZER, Judge.
We grant rehearing in order to clarify the Court's opinion in this case.
*1053 In this case, the only issue for the trier of fact was the amount of damages sustained by plaintiffs as a result of the death of John Francis Cristadoro. For the reasons set forth in our original opinion's "Statement of Facts: Damages", we conclude that the trier of fact was manifestly erroneous and clearly wrong as to the special damages and abused its great, even vast discretion in its award of general damages, having awarded a total of $2,500,000.
We find, for the reasons set forth in our original opinion's "De novo Review" that the highest amounts that a reasonable trier of fact could award to these plaintiffs for these specific injuries are $334,205 total economic loss, including $18,116 future loss to Brandon Cristadoro through the age of twenty-one; and $750,000 for the decedent's own loss of the companionship of his children and the intangible elements of his own life, for a total award to plaintiffs of $1,102,321.00.

CONCLUSION AND DECREE:
ON REHEARING GRANTED: JUDGMENT OF TRIAL COURT REVERSED; JUDGMENT RENDERED IN THE AMOUNT OF $1,084,205.
MURRAY, J., concurs with reasons.

ON REHEARING
I concur in the conclusion that the quantum of damages found by the trier of fact was manifestly erroneous and constituted an abuse of discretion. I agree that the amounts of general and special damages awarded by the majority in the original opinion and reaffirmed on rehearing are the highest amounts a reasonable trier of fact could award in this case.
BAGNERIS, J., dissents.
I respectfully dissent from the majority opinion, and I would affirm the judgment of the trial court as it relates to quantum of damages, special damages and general damages.
NOTES
[1] Mr. Pollard's name appears at times as "Pollart" in the transcript.