# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 04-1293

DELTON COUTEE

VERSUS

GLOBAL MARINE DRILLING COMPANY

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20015646
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and James T. Genovese, Judges.

**AFFIRMED IN PART, REVERSED IN PART,  AND RENDERED.**

Delos E. Flint, Jr.
George J. Fowler, III
Lawrence R. Demarcay, III
Fowler, Rodriguez & Chalos
400 Poydras Street - 30th Floor
New Orleans, LA 70130
Telephone:  (504) 523-2600
COUNSEL FOR:
    Defendant/Appellee - Global Marine Drilling Company

Eugene A. Ledet, Jr.
RIVERS, BECK, DALRYMPLE & LEDET
P. O. Drawer 12850
Alexandria, LA 71315-2850
Telephone:  (318) 445-6581
COUNSEL FOR:
    Plaintiff/Appellant - Delton Coutee

THIBODEAUX, Chief Judge.

In this Jones Act negligence case, plaintiff, Delton Coutee, appeals the judgment of the trial court in favor of defendant, Global Marine Drilling Company (Global Marine). The trial court concluded that Mr. Coutee failed to prove that the Global Marine vessel from which he fell was unreasonably unsafe for its intended purposes under the Jones Act. The trial court also found that Mr. Coutee was entitled to a cure award of $1,885.11, but that Global Marine paid Mr. Coutee $17,633.00 in settlement advances which offset the cure award; thus, Mr. Coutee is not entitled to attorney fees in conjunction with his cure award.

For the following reasons, we reverse the judgment of the trial court with respect to its finding that failure to provide hand/guard rails was not negligence per se and finding that Global Marine was not callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent when it refused to pay Mr. Coutee the amount of cure benefits to which he was entitled. We award $10,000.00 in attorney fees for Global Marine's refusal. We further reverse the judgment of the trial court and find that Mr. Coutee sustained a back injury as a result of Global Marine's negligence per se and render judgment awarding $100,000.00 in general damages, $60,000.00 for past lost earnings, and $300,000.00 for future loss of earnings. We affirm the judgment with respect to its finding that the SALA block was not defective and that Mr. Coutee was entitled to additional cure benefits.

I.

**ISSUES**

We shall consider whether:

(1)     the trial judge erred in finding that Global Marine's
        failure to provide guardrails on the platform erected

1

around the Blowout Preventer Stack (BPS), a regulatory safety violation, was excused due to storage space constraints and his use of a safety harness;

(2)     the trial judge committed legal error by failing to strike the testimony of Dr. Rayland K. Beurlot; and,

(3)     the trial court's refusal to award compensatory damages and attorney fees was error.

## II.

## FACTS

Mr. Coutee filed suit against Global Marine under the Jones Act, 46 U.S.C. § 688. There is no dispute that Mr. Coutee fell off of the Blowout Preventer (BOP) stack on January 7, 2001, while working as a seaman on the drilling vessel Glomar Adriatic II (Glomar) on his third day of an eleven-day work period. The BOP stack is located underneath the drill floor and is used to control well pressure while drilling.

The BOP stack consists of several hydraulically-powered valves that are stacked one on top of the other. Customarily, crews working on the BOP stack use riding belts to climb the stack. When Mr. Coutee fell from the BOP stack, he was in the process of "nippling down" (removing) the BOP stack lubricator. The lubricator is attached to the BOP stack by a flange, or the "hydrill," by four large nuts and bolts. The hydrill is just above the lubricator. The lubricator equipment is also used to control pressure during wireline operations. It is common practice to change out the lubricator's bell nipple during drilling, completion, and wire line operations.

In an effort to assist its employees in the removal of the equipment located directly above the hydrill, Global attached a half-moon shaped platform that measured four feet long and one-and-a-half feet at its widest point. Use of the

2

platform began in the 1990s. The platform was not permanently attached to the hydrill, but was held there by steel strapping. The form of attachment used made it possible to remove the platform when not in use. Don Jeffery Bass, who was employed by Global Marine as a night tool pusher at the time of Mr. Coutee's accident, testified that prior to using the temporary platform, employees had to perform the nipple down procedure while sitting down in a riding belt. Mr. Coutee testified that he was familiar with performing the nipple down procedure because it had to be done each time the rig completed drilling a well. The employees performing the nipple down procedure were also equipped with a safety harness that included an inertia reel. The inertia reel is set to stop the fall of a person when the speed of the fall from the platform reaches a certain velocity. Mr. Coutee agreed that having a platform to stand on made conducting the nipple down procedure easier.

On the day of the accident, Mr. Coutee and a co-employee, Eddie Bell, put on their safety harnesses and climbed onto the platform deck to nipple down the lubricator. To loosen the bolts, a hammer wrench is used. The process of removing the flange involved attaching the wrench to the bolt with the proper "bite" and pulling on the wrench to get the bolt loose. Next, a rope is tied to the handle of the wrench and while one worker holds the bite of the wrench on the bolt, the other uses the sledge hammer to hit and break the bolt. Mr. Coutee testified that if the person holding the rope on the handle of the wrench leans forward, the bite that the wrench has on the bolt is released which may cause that person to lose his balance. In the present case, three of the four flange bolts were successfully removed using the above equipment and process. However, the fourth bolt could not be removed using the hammer wrench; therefore, a pipe wrench was used instead. Mr. Coutee also testified that he did not use a rope when trying to remove the fourth bolt. Instead, he used

3

only his hands to pull on the pipe wrench. In the process of loosening the bolt, Mr. Coutee lost his balance and fell approximately four feet from the platform before the inertia reel stopped his fall. Mr. Coutee asserts that the inertia reel of his safety harness did not work properly, causing him to fall lower and faster than he should have, and that platform was dangerous due to the lack of handrails.

Mr. Coutee indicated on an accident report that his complete body was sore. He also stated that his neck, back and hip, both the right and left sides, were affected by the fall. After his eleven days on the rig, Mr. Coutee testified that his level of pain increased. He saw several physicians and underwent numerous diagnostic tests for his pain. Global Marine referred Mr. Coutee to his first physician, Dr. Robert Smith, an industrial medicine specialist. He was first seen on January 29, 2001. By November 2001, Dr. Smith determined that Mr. Coutee had reached maximum medical improvement (MMI). While treating with Dr. Smith, Mr. Coutee had been seen by Dr. Lawrence Drerup, a neurosurgeon, had his records reviewed by Dr. Stephen Cavanaugh, another neurosurgeon, and had undergone a functional capacity examination at the Fontana Center in Lafayette, Louisiana. Dr. Cavanaugh reviewed Mr. Coutee's medical records after Global Marine denied Mr. Coutee's and Dr. Smith's request that he be seen by Dr. John Cobb, an orthopedic surgeon. Global Marine denied Dr. Smith's recommendation that Dr. James Quillin, a psychologist, examine Mr. Coutee.

In March 2002, Mr. Coutee applied for employment with the Rapides Parish Police Jury (Police Jury) as an equipment operator. In connection with the application he was required to undergo a pre-employment physical and on March 26, 2002, Mr. Coutee saw Dr. Smith for the physical. Although Dr. Smith knew of Mr. Coutee's previous accident and complaints of pain, he administered the standard pre-

4

employment physical that he conducts for any applicant. Dr. Smith testified that Mr. Coutee told him that he was doing well and did not complain of any back pain. Based upon the results of the physical and a lift evaluation, Mr. Coutee was cleared to return to work at a very heavy physical demand level. The Police Jury employment was for a particular project and at its conclusion in the latter part of 2002, Mr. Coutee was laid off.

Although he was able to pass the pre-employment physical which indicated that he had the capacity to engage in very heavy physical labor, Mr. Coutee continued to see doctors complaining about back pain. On February 12, 2003, he saw Dr. Miguel Garcia, an internal medicine specialist who treated his complaints of pain with steroid injections. He was also seen by Dr. Cobb who recommended that Mr. Coutee undergo surgery to relieve his pain. Dr. Quillin diagnosed Mr. Coutee with major episodic depression, moderate secondary to persistent pain and chronic pain syndrome secondary to an occupational injury. Dr. Quillin also found that although Mr. Coutee reported high levels of pain, he had excellent resumption of general activities and noted that this type of pain adjustment was not normal. Subsequent to his release by Dr. Smith in November 2001, Mr. Coutee paid for his own medical diagnostic tests and treatment.

After hearing all of the evidence, the trial court found that Mr. Coutee was entitled to a maintenance and cure award of $1,885.11 for his visits with Drs. Cobb, Garcia and Quillin, for which he personally paid. There is no dispute that Global Marine continued to pay Mr. Coutee his wages from the time of his accident until Dr. Smith declared him to be at MMI. The trial court concluded that Global Marine is entitled to a credit equal to $1,885.11, the amount of the cure award, due to its payment of wages to Mr. Coutee. Further, the trial court did not find that Mr.

Coutee was entitled to an award of attorney fees for Global Marine's failure to pay the $1,885.11 for maintenance and cure or that he was entitled to compensatory damages. It is from this judgment that Mr. Coutee appeals.

III.

## LAW AND DISCUSSION

### *Standard of Review*

Mr. Coutee raises the issue of the standard of review applicable to this case. He states that the trial court committed a legal error in finding that the work platform, from which he fell and sustained injuries, complied with government regulations. It appears that Mr. Coutee seeks to have this court review the trial court's decision pursuant to a standard other than manifest error. The Jones Act allows an injured seaman to bring a negligence action against his employer. 46 U.S.C.A. § 688. Mr. Coutee's Jones Act case, although brought in state court, is subject to federal substantive maritime law. *Folse v. Gulf Tran, Inc.* 03-758 (La.App. 1 Cir. 2/23/04), 873 So.2d 718.

In *Verdin v. Rogers*, 03-1457, p. 4 (La.App. 5 Cir. 4/27/04), 873 So.2d 804, 807, *writ denied*, 04-1231 (La. 9/24/04), 882 So.2d 1128, the court stated: "[a] threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. Whether a duty is owed is a question of law." Whether the duty owed was breached is a question of fact. *Vermillion Parish Police Jury v. Albert*, 03-1420 (La.App. 3 Cir. 3/3/04), 867 So.2d 67. In his argument, Mr. Coutee does not question the trial court's use of 33 C.F.R. § 143.110, but instead disagrees with the trial court's finding that his employer's duty pursuant to 33 C.F.R. § 143.110 was not breached. Thus, the manifest error-clearly wrong standard of review is applicable to this case. However, we are duty bound to reverse trial court judgments that are clearly without

6

evidentiary support. *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099 (La. 7/5/94), 639 So.2d 216.

### *Safety Statute*

Mr. Coutee asserts that Global Marine violated 33 C.F.R. § 143.110 because it failed to provide guardrails around the platform upon which he was working. This regulation provides the following with respect to the use of guards and rails on work platforms:

> (a) Except for helicopter landing decks which are provided for in paragraph (b) of this section, and areas not normally occupied, the unprotected perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence. The guard or rail or fence shall be at least 42 inches high. The two intermediate rails shall be so placed that the rails are approximately evenly spaced between the guard rail and the floor or deck area: Provided, that if a toe board is installed then one of the intermediate rails may be omitted and the other rail placed approximately half way between the top of the toe board and the top guard rail.

> (b) The unprotected perimeter of the helicopter landing deck shall be protected with a device of sufficient strength and size as to prevent any person from falling from such deck.

> (c) Each catwalk and each stairway shall be provided with a suitable guard rail or rails, as necessary.

The parties do not dispute that the hydrill platform or deck area involved in the present case did not have any type of guard rail. Global Marine argues, for the first time on appeal, that 33 C.F.R. § 143.110 is inapplicable to the present case because it is an "area not normally occupied;" therefore, guard rails are not necessary. In its written reasons for ruling, the trial court stated: "Clearly the half-moon platform, being located more than ten feet above the production floor, was required to have some type of fall protection." We infer from this statement that the trial court

7

found the "area[] [was] normally occupied" such that 33 C.F.R. § 143.110 requiring guard rails in such areas, was applicable and that Global Marine violated the regulation. The issue is whether the trial court was correct in finding that the lack of guard rails, a violation of 33 C.F.R. § 143.110, did not amount to negligence per se. Under the Jones Act, a regulatory violation can amount to negligence per se if the following five elements are met:

> (1) a violation of Coast Guard regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the regulations, (3) an injury of a type against which the regulations are designed to protect, (4) the unexcused nature of the regulatory violation, and (5) causation.

*Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 160 (5th Cir. 1985).

The purpose of the Jones Act is to protect those who work in inherently dangerous environments. *Duzon v. Stallworth*, 01-1187 (La.App. 1 Cir. 12/11/02), 866 So.2d 837, *writ denied*, 03-605 (La. 5/2/03), 842 So.2d 1110. It provides to seamen the same rights given to railway workers under the Federal Employer's Liability Act (FELA) with the twin purposes: "to eliminate a number of traditional defenses to tort liability and to facilitate recovery in meritorious cases." *Atchison, Topeka and Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561, 107 S.Ct. 1410, 1413 (1987). "[T]he general congressional intent was to provide liberal recovery for injured workers." *Kernan v. American Dredging Co.*, 355 U.S. 426, 432, 78 S.Ct. 394, 398 (1958). In the present case, the trial court found that Mr. Coutee had met every element of proof for negligence per se with the exception of number (4), when it concluded that the failure of Global Marine to provide guard rails on the hydrill platform was excused due to space constraints.

We agree with the trial court that 33 C.F.R. § 143.110 is applicable to the platform in this case and that Global Marine violated that regulation. We disagree

8

with the trial court's conclusion that Global Marine's failure to provide guard rails on the hydrill platform is excused, thus precluding a finding of negligence per se. There is nothing in Section 143.110 or jurisprudence that excuses the failure to provide proper fall protection due to lack of space. In *Smith*, the court, in finding that the violation of a safety regulation was excused, stated "there was no showing of a *present emergency* or *other condition* where installation of a railing would have been *more dangerous than violation of the regulations*." *Smith*, 772 F.2d at 161. (Emphasis added). Likewise, in the present case, there was no evidence of an emergency or a condition that would have made it more dangerous to install guardrails than to violate 33 C.F.R. 143.110 which requires "unprotected perimeters of all floor or deck areas [to be] rimmed with guards or rails." Therefore, we find that the trial court erred in concluding that Global Marine's failure to provide guard rails on the work platform was an excusable violation of 33 C.F.R. § 143.110.

### *Unreasonable Risk of Harm-SALA Block*

Mr. Coutee argues that the SALA Block malfunctioned when he fell from the platform because it failed to properly stop his fall. The trial court ruled that the SALA Block worked as it was designed and did not present an unreasonable risk of harm to Mr. Coutee. The SALA Block or inertia reel is a device attached to the safety harness that arrests the fall of a person when the velocity of the fall reaches a pre-set speed. The SALA Block was set to arrest the fall when a velocity of 4.3 feet per second was reached.

Eddie Bell, who was working with Mr. Coutee at the time of the accident, testified that Mr. Coutee fell about three to four feet below the hydrill platform upon which they were working. Mr. Bell was also under the misconception that had the SALA Block worked properly, Mr. Coutee would have fallen only one

foot. As noted above, the SALA Block was set to stop a fall that reached 4.3 feet per second velocity. Thus, the basis of Mr. Bell's testimony that the SALA Block malfunctioned is flawed. Furthermore, Mr. Coutee also testified that he fell a maximum of four feet before his fall was stopped by the SALA Block. Dr. Tim Harrigan, Global Marine's biomechanics expert, testified that if Mr. Coutee fell nine feet from the platform upon which he was working, which would be five feet below the platform, then the SALA Block did not function correctly. However, the evidence shows, and the trial court concluded, that he did not fall nine feet. Mr. Coutee fell four feet, which was within the parameters of the arrest mechanism of the SALA Block. We find no error in the trial court's decision to believe the testimony stating that Mr. Coutee only fell four feet from the hydrill platform.

### Expert Witness Testimony

Mr. Coutee asserts that the trial court erred in failing to strike the testimony of Dr. Beurlot because counsel for Global Marine had engaged in *ex parte* communications with both Drs. Smith and Beurlot, his treating physicians. Mr. Coutee was referred to Dr. Beurlot by his original treating physician, Dr. Smith. The trial court refused to allow Mr. Coutee's counsel to question Dr. Beurlot regarding Global Marine's *ex parte* communications. The trial judge reasoned: "I'm not going to allow this line of questioning. Because, when somebody files litigation, they put their physical condition at issue. And I'm not going to allow you to badger this witness in that way." Counsel for Mr. Coutee proffered the testimony.

The proffered testimony reveals that Dr. Beurlot admitted that he communicated with counsel for Global Marine, Mr. Lawrence R. DeMarcay, III (Mr. DeMarcay), when Mr. DeMarcay sent him documents, engaged in telephone conversations and met with him. A week before trial, Dr. Beurlot testified that he and

10

Mr. DeMarcay "met and went over [his] previous records and deposition. He [Mr. DeMarcay] also added that they had since taken the deposition of the gentleman that administered the FCE and there might be some other depositions." On the morning of trial, Mr. DeMarcay gave Dr. Beurlot a copy of his deposition to review. Mr. DeMarcay also provided Dr. Beurlot with Mr. Coutee's personnel records from the time that he was employed at Allied Tires as well as documentation from the Department of Labor regarding work requirements of jobs such as a tire technician, roughneck and roustabout. Contact with counsel for Global Marine and Dr. Beurlot was done without notice to counsel for Mr. Coutee and subsequent to Dr. Beurlot's examination of Mr. Coutee.

Mr. Coutee argues that the *ex parte* communications between counsel for Global Marine and Dr. Beurlot violated La.Code Evid. art. 510 that provides in pertinent part:

> B. (1) **General rule of privilege in civil proceedings.** In a non-criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself or his representative, his health care provider, or their representatives.

> (2) **Exceptions.** There is no privilege under this Article in a noncriminal proceeding as to a communication:

> (a) When the communication relates to the health condition of a patient who brings or asserts a personal injury claim in a judicial or worker's compensation proceeding.

> (b) When the communication relates to the health condition of a deceased patient in a wrongful death, survivorship, or worker's compensation proceeding brought or asserted as a consequence of the death or injury of the deceased patient.

(c) When the communication is relevant to an issue of the health condition of the patient in any proceeding in which the patient is a party and relies upon the condition as an element of his claim or defense or, after the patient's death, in any proceeding in which a party deriving his right from the patient relies on the patient's health condition as an element of his claim or defense.

(d) When the communication relates to the health condition of a patient when the patient is a party to a proceeding for custody or visitation of a child and the condition has a substantial bearing on the fitness of the person claiming custody or visitation, or when the patient is a child who is the subject of a custody or visitation proceeding.

(e) When the communication made to the health care provider was intended to assist the patient or another person to commit or plan to commit what the patient knew or reasonably should have known to be a crime or fraud.

(f) When the communication is made in the course of an examination ordered by the court with respect to the health condition of a patient, the fact that the examination was so ordered was made known to the patient prior to the communication, and the communication concerns the particular purpose for which the examination was made, unless the court in its order directing the examination has stated otherwise.

(g)(i) When the communication is made by a patient who is the subject of an interdiction or commitment proceeding to his current health care provider when such patient has failed or refused to submit to an examination by a health care provider appointed by the court regarding issues relating to the interdiction or commitment proceeding, provided that the patient has been advised of such appointment and the consequences of not submitting to the examination.

(ii) Notwithstanding the provisions of Subitem (i) of this Item, in any commitment proceeding, the court-appointed physician may review the medical records of the patient or respondent and testify as to communications therein, but only those which are essential to determine whether the patient is dangerous to himself, dangerous to others, or unable to survive safely in freedom or protect himself from serious harm. However, such communications shall not be disclosed unless the patient was informed prior to the communication that such

12

communications are not privileged in any subsequent commitment proceedings. The court appointed examination shall be governed by Item B(2)(f).

(h) When the communication is relevant in proceedings held by peer review committees and other disciplinary bodies to determine whether a particular health care provider has deviated from applicable professional standards.

(i) When the communication is one regarding the blood alcohol level or other test for the presence of drugs of a patient and an action for damages for injury, death, or loss has been brought against the patient.

(j) When disclosure of the communication is necessary for the defense of the health care provider in a malpractice action brought by the patient.

(k) When the communication is relevant to proceedings concerning issues of child abuse, elder abuse, or the abuse of disabled or incompetent persons.

(l) When the communication is relevant after the death of a patient, concerning the capacity of the patient to enter into the contract which is the subject matter of the litigation.

(m) When the communication is relevant in an action contesting any testament executed or claimed to have been executed by the patient now deceased.

Paragraphs (D) and (E) of La.Code Evid. art. 510 provide for the persons who may claim the privilege and waiver of the privilege as follows:

D. **Who may claim the privilege.** In both civil and criminal proceedings, the privilege may be claimed by the patient or by his legal representative. The person who was the physician, psychotherapist, or health care provider or their representatives, at the time of the communication is presumed to have authority to claim the privilege on behalf of the patient or deceased patient.

E. **Waiver.** The exceptions to the privilege set forth in Paragraph B(2) shall constitute a waiver of the privilege *only as to testimony at trial or to discovery of the privileged communication by one of the discovery methods authorized by Code of Civil Procedure Article 1421 et seq., or pursuant to R.S. 40:1299.96 or R.S. 13:3715.1.*

(Emphasis added). Thus, in this case, although the physician-patient privilege exists between Dr. Beurlot and Mr. Coutee, an exception is applicable because Mr. Coutee put his physical condition at issue when he filed a Jones Act suit against Global Marine seeking damages for the injuries he suffered. However, La.Code Evid. art. 510 (E), makes it clear that the exception to the privilege can only be effectuated through testimony at trial or by the use of proper discovery methods. The information regarding Mr. Coutee's physical condition given to Dr. Beurlot by counsel for Global Marine by way of meetings, documentation and telephone calls, was clearly not "testimony at trial" and was not provided to Dr. Beurlot through proper discovery methods, with notice of such contact given to counsel for Mr. Coutee. Therefore, we find that although an exception to the general rule of physician-patient privilege is applicable pursuant to La.Code Evid. art. 510 (B)(2)(a), paragraph (E) of Article 510 limits the application of the exception. In the present case, the privilege was breached when counsel for Global Marine went outside of the proper discovery procedures when discussing Mr. Coutee's health with Dr. Beurlot, one of his treating physicians.

The trial court denied Mr. Coutee's motion to exclude the testimony of Dr. Beurlot, reasoning as follows:

> I went back and read all of my notes from Dr. Beurlot's testimony and compared it with the medical records, and I find nothing startling between what he testified here in court and what the medical records say. His testimony is consistent with those medical records. And I feel, in this case, that it would be inappropriate to exclude his testimony based upon Article 510, because I feel there was no prejudice to the plaintiff, even if they did not use the authorized means of discovery to get this information.

The trial court also noted that even if La.Code Evid. art. 510 was violated, the sanction provision of that Article provides for sanctions against the attorney and not exclusion of the witness's testimony. La.Code Evid. art. 510 (G). This argument is

14

also advanced by Global Marine. To support its position, Global Marine cites *Hortman v. Louisiana Steel Works*, 96-1433 (La.App. 1 Cir. 6/20/97), 696 So.2d 625, *writ denied*, 97-1919 (La. 11/7/97), 703 So.2d 1268, where the plaintiff failed to tell his treating physician the truth about his ability to work. The only jobs the *Hortman* plaintiff attempted to obtain were of medium-level duty as opposed to light duty or sedentary jobs recommended by his doctors. Thus, it was discovered that his doctor's opinion that the plaintiff could not work was based on the erroneous information. The doctor obtained the information about the plaintiff's failure to look for light-duty work and the work he attempted to do at a level more strenuous than his work release orders provided by speaking with counsel for the defendant outside of the proper discovery methods, a violation of La.Code Evid. art. 510. In *Hortman*, the court concluded that "any sanctions for such a violation [of La.Code Evid. art. 510] should be against the attorneys in the case, and not against the litigants, and should not in any case result in the exclusion of evidence." *Id*. at 628. However, it appears that although *Hortman* strongly advised that a violation of La.Code Evid. art. 510 should not lead to the exclusion of evidence, other language in the opinion makes it clear that an abuse of the trial court's discretion in allowing such testimony could be grounds for excluding that testimony where it states: "We find that the . . . determination to allow Dr. Ipollo's deposition into evidence and let it be considered with the weight of the other evidence was not an abuse of discretion, nor was it manifest error." *Id*. at 629.

Furthermore, *Boutee v. Winn-Dixie Louisiana, Inc.*, 95-1123 (La.App. 3 Cir. 4/17/96), 674 So.2d 299, *writ denied*, 96-1936 (La. 11/8/96), 683 So.2d 268, determined that improper communication occurred between the defendant and the plaintiff's treating physician where privileged information was divulged. A reversal

was warranted where the "defendant's clear abuse of justice, even if not ill intended" substantially impacted the course of the trial. *Id.* at 306. *Boutee* makes it clear that violations of La.Code Evid. art. 510 can result not only in sanctions against the attorney violator, but also reversible error or the elimination of testimonial evidence if the violation rises to the level of tainting the integrity of the trial. Thus, the issue becomes whether the trial court abused its discretion in allowing Dr. Beurlot to give his opinion testimony in this case, taking into consideration the violation of La.Code Evid. art. 510 by counsel for Global Marine and the effect it had on the trial. For the following reasons, we find that the trial court abused its discretion.

Unlike the situation presented in *Hortman*, where the plaintiff had "ample notice" of his opposing counsel's improper communication with his physician, Mr. Coutee had no notice of such communications between counsel for Global Marine and Dr. Beurlot until the day of trial. Furthermore, in *Hortman*, there was a deposition conducted subsequent to the improper communication at which the plaintiff was present, thus providing "ample time to prepare a rebuttal to . . . [the] testimony." *Hortman*, 696 So.2d at 629. All opportunity for Mr. Coutee's counsel to confront Dr. Beurlot occurred before the improper communication. The trial court found that Dr. Beurlot's testimony was consistent with the medical record evidence and caused Mr. Coutee no "prejudice" to his case. We disagree with that finding. In any personal injury case, the credibility of the person claiming injury is important. In *Boutee*, the plaintiff's treating physician who improperly communicated with the defense counsel testified, not for the plaintiff, but for the defense. Although his testimony was limited to a narrow factual question, the fact that he was called by the defense "cast a pall over the entire proceedings." *Boutee,* 674 So.2d at 306. Likewise, in the present case, Dr. Beurlot was called, not by Mr. Coutee, but by

Global Marine. Moreover, at trial he offered his opinion that Mr. Coutee may be intentionally magnifying his symptoms of pain; however, this opinion is not stated in his records regarding Mr. Coutee. Like the testimony of the doctor in *Boutee*, Dr. Beurlot's testimony "cast[ed] a cloud over [Mr. Coutee's] overall credibility as a witness." *Id.* Our review of the evidence leads us to believe that, absent Dr. Beurlot's testimony, the case may have been decided differently. Thus, we find that the trial court abused its discretion by admitting the testimony of Dr. Beurlot.

### *Attorney Fees*

Mr. Coutee asserts that he is entitled to an award of attorney fees because Global Marine was unreasonable and callous in its failure to provide authorization for his treatment with Drs. Cobb, Miguel Garcia, and Quillin. Global Marine asserts that its actions were reasonable when it terminated Mr. Coutee's maintenance and cure. In *Muhammad v. Diamond Offshore Co.*, 02-172, p. 11 (La.App. 3 Cir. 7/10/02), 822 So.2d 869, 876, *writ denied*, 02-2409 (La. 11/27/02), 831 So.2d 279, *cert. denied*, 538 U.S. 1056, 123 S.Ct. 2215 (2003) quoting from *Domenter v. C.F. Bean Corp.*, 99-1204, pp. 17-19 (La.App. 5 Cir. 4/25/00), 761 So.2d 629, 640, *writ denied*, 00-1872 (La. 9/29/00), 770 So.2d 354, we explained that "[c]ure is payment of the seaman's medical, therapeutic and hospital expenses, until that point in time when plaintiff reaches maximum medical recovery." The payment of cure is not fault based, but "arises from the contractual relationship between the parties[.]" *Id.* The remedy is curative in nature and not intended to be compensation for injury. "[T]he liability of a shipowner for maintenance and cure will be excused only by willful misbehavior or deliberate act of indiscretion on part of seaman." *Id.* "An award for attorney's fees is proper only if the employer has been found to have acted in a fashion which is 'callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent.'

17

*Id.* at 877. "[M]aximum cure has been reached . . . . where it is probable that further treatment will result in no betterment in the claimant's condition." *Boudreaux v. U.S.*, 280 F.3d 461, 468 (5 Cir. 2002) *quoting Rashidi v. American President Lines*, 96 F.3d 124, 128 (5 Cir. 1996). The court in *Morales v. Garijak, Inc.,* 829 F.2d 1355, 1358 (5 Cir. 1987) stated:

> Thus, there is an escalating scale of liability: a shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages. If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.

The trial court held that Mr. Coutee was entitled to additional cure benefits of $1,885.11 for his visits to Drs. Cobb, and Quillin. Global Marine has not appealed that ruling. Not included in the trial court's cure benefits award is the amount of Mr. Coutee's expenses associated with his visits to Dr. Garcia in 2003, over a year after he was released by Dr. Smith. However, the trial court further found that Global Marine paid $17,633.00 to Mr. Coutee in "settlement advances," and that amount served to set off the cure benefit award of $1,885.11. Trial testimony in this case reveals that the parties stipulated that the $17,633.00 paid to Mr. Coutee by Global Marine were "in addition to maintenance and cure." Moreover, testimony by the economists regarding Mr. Coutee's loss of earning capacity, past/future wages, indicates that the $17,633.00 advance was for wages. Thus, the funds advanced to Mr. Coutee were not given to Mr. Coutee to satisfy Global Marine's obligation to provide cure benefits. Therefore, the trial court erred in concluding that the funds advanced provided a set off for the amount of cure still owed to Mr. Coutee in the amount of $1,885.11.

18

A review of the record reveals instances in which Global Marine acted in a willful, callous, or persistent manner. There is no dispute that Global Marine paid $8,694.00 in maintenance through December 19, 2001. Dr. Smith found that Mr. Coutee had reached MMI on November 2, 2001. However, prior to Dr. Smith's finding that Mr. Coutee had reached MMI, Mr. Coutee requested to see Dr. Cobb for an evaluation of his condition. Mr. Coutee's request to see a doctor of his choice was denied by Global Marine; thus, all of Mr. Coutee's treating physicians were doctors chosen by Global Marine. Furthermore, even when the doctor of Global Marine's choosing sought authorization for Mr. Coutee to be seen by a psychologist, representatives handling Mr. Coutee's claim for Global Marine denied that request. It is clear from the record that Global Marine acted callously in the manner in which it prevented Mr. Coutee from seeing his choice of physician. Global Marine presented no just reason for its refusal to authorize an examination by a psychologist as recommended by its chosen physician. Therefore, we find that attorney fees in the amount of $10,000.00 is warranted in this case. With respect to compensatory damages, we find that there is no evidence that Global Marine's failure to fully pay Mr. Coutee's cure benefits resulted in exacerbation of his condition. See *Domonter*, 761 So.2d at 640. Thus, we will not award any amount for compensatory damages related to Global Marine's failure to pay cure benefits.

### *Remand and Damages*

The trial court found that Mr. Coutee failed to prove that Global Marine was negligent. Thus, it did not address the issue of Mr. Coutee's damages. Mr. Coutee asserts that this court should make an award based on the present record on appeal. To the contrary, Global Marine asserts the case should be remanded to the district court for a determination of any damages to which Mr. Coutee may be

entitled. "[W]hen an otherwise complete trial record exists, the general rule is that an appellate court should, if it can, render judgment on the record." *Estate of Cristodoro v. Gold-Kist, Inc.*, 01-26, p. 27 (La.App. 4 Cir. 1/23/02), 819 So.2d 1034, 1050, *writ denied*, 02-1325 (La. 9/13/02), 824 So.2d 1171 *citing Jones v. Black*, 95-2530 (La. 6/28/96), 676 So.2d 1067 *citing Gonzales v. Xerox*, 320 So.2d 163, 165 (La.1975). Only "[w]here a view of the witnesses is *essential* to a fair resolution of conflicting evidence, the case should be remanded for a new trial." (Emphasis in original). *Jones*, 676 So.2d at 1067 *quoting Ragas v. Argonaut Southwest Ins. Co.*, 388 So.2d 707, 708 (La.1980). "[A]lthough a view of the witnesses is always helpful in determining the facts of a case, it is not essential to a fair resolution of the conflicting evidence." *Estate of Cristodoro*, 819 So.2d at 1051. Further, when legal error is found and a complete record has been made, the appellate court is to conduct a de novo review of the record. *Smith v. Smith*, 615 So.2d 926 (La.App. 1 Cir.), *writ denied*, 617 So.2d 916 (La.1993).

Global Marine asserts that the amount of damages to which Mr. Coutee is entitled for his pain and suffering as a result of any injury he sustained is dependent upon, not only his medical records and his physicians' testimony, but also upon his own testimony as to the extent of his injury. As such, Global Marine argues that a major issue in this case is Mr. Coutee's credibility, which can only be ascertained by a view of the witnesses and not by a reading of the cold record. Thus, this case should be remanded to the trial court for a trial on the damages. We disagree. In *Gonzales*, 320 So.2d at 165-66, the supreme court noted:

> [T]here is a very practical consideration which encourages our appellate courts to exercise their jurisdiction to review factual findings: judicial economy. When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial

determination process. Although the appellate court does not gain the benefit of personally viewing the witnesses, it does have a complete record and the constitutional authority to decide.

The record in this case is voluminous. There is no question that Mr. Coutee was involved in an accident and was injured. We have found that Global Marine's negligence in failing to provide handrails on Mr. Coutee's work deck was the cause of the accident. The only issue is the extent of Mr. Coutee's injuries. Mr. Coutee testified at trial and was rigorously cross-examined by counsel for Global Marine. The record also contains extensive medical reports from the various physicians who evaluated and treated Mr. Coutee as well as testimony from those physicians. Further, the practical effect of remand in this case is that should either party be dissatisfied with the trial court outcome, the case will again come before this court with the same voluminous record at additional and unnecessary costs to the litigants.

After his accident on January 7, 2001, Mr. Coutee saw Dr. Smith on January 29, 2001, in the Rapides Industrial Medical Center (RIMC) on the recommendation of his employer, Global Marine. The RIMC is a medical practice that treats work-related injuries and performs drug testing. Dr. Smith's practice is limited to occupational and environmental medicine. Although there is a board certification in those fields, Dr. Smith admitted that he does not have such board certification. Dr. Smith also admitted that he did not complete a general surgery residency program upon graduation from medical school.

On his first visit, Mr. Coutee provided Dr. Smith with a history of falling from a platform at work and dangling from his harness. He complained of neck and hip pain as well as cramping and headaches. The nurse's notes in the doctor's records also indicate that he stated that the cramping pain was in his middle and lower back.

Dr. Smith testified that Mr. Coutee had objective signs of spasm in his cervical back area and diagnosed him with cervical sprain. Dr. Smith admitted that, despite his nurse's notes regarding Mr. Coutee's complaints of pain in his middle and lower back area, he did not perform an examination of that area. The doctor testified that he asked Mr. Coutee to focus on the part that was bothering him the most at the time which happened to be his neck area.

During a second visit, Mr. Coutee told Dr. Smith that his neck pain had gotten a little better but that his back pain had begun to intensify. The doctor explained that it was not unusual for Mr. Coutee to now complain about his back because treatment of his neck lessened that pain causing other pain to become more prominent. Dr. Smith suspected that Mr. Coutee had a herniated disc or sustained some type of trauma to the ligaments in his lower back. Dr. Smith declared Mr. Coutee unable to work and unable to lift anything over ten pounds. During an examination in February 2001, Mr. Coutee complained about weakness in his left leg, which Dr. Smith opined is consistent with radiculopathy at the S-1 level of the back. Dr. Smith ordered an MRI. The MRI revealed multiple levels of degenerative disc disease which was consistent with Mr. Coutee's complaints of leg weakness. Dr. Smith recommended that Mr. Coutee be examined by Dr. Drerup, a neurosurgeon. At the conclusion of his examination, Dr. Drerup found that Mr. Coutee was suffering from myofascial pain syndrome and a herniated disc at the L4-5 level on the right side. However, Dr. Smith's notes stated that Mr. Coutee's pain was on the left side. Dr. Smith recommended that Mr. Coutee undergo physical therapy. Mr. Coutee expressed frustration with the course of his treatment and requested that he be seen by Dr. Cobb, an orthopedic doctor. Global Marine refused to authorize an examination by Dr. Cobb, but granted authorization for Mr. Coutee to be seen by

22

another neurosurgeon in Shreveport. Mr. Coutee was never physically examined by Dr. Cavanaugh, the neurosurgeon in Shreveport recommended by Global Marine; however, Dr. Cavanaugh reviewed Dr. Smith's medical records.

Dr. Smith continued to see Mr. Coutee with complaints of pain focused on his lower back. Dr. Smith treated Mr. Coutee conservatively by use of medications and physical therapy. By March 2001, Mr. Coutee complained about pain in his right leg and informed Dr. Smith that physical therapy made the pain worse. However, this was not the first time that Mr. Coutee complained about right leg pain as Global Marine suggests. Dr. Smith's notes of February 19, 2001, reveal Mr. Coutee complained of right leg pain six weeks after his accident. Dr. Smith prescribed Vioxx and restricted his work level to sedentary. A functional capacity evaluation (FCE) was performed at the Fontana Center in Lafayette, Louisiana, a center that was not the choice of Dr. Smith, but one authorized by Global Marine. By June 2001, Dr. Smith testified that Mr. Coutee still exhibited objective signs of pain with muscle spasms between his shoulder blades. He made a referral to Dr. Stephen Katz, an anesthesiologist who specializes in pain management. Future requests by Dr. Smith and Mr. Coutee to see Dr. Cobb were denied by Global Marine. Dr. Smith testified that by October 24, 2001, Mr. Coutee was approaching maximum medical improvement (MMI) but that he was not symptom-free. Dr. Smith explained that MMI meant that he had done all he could do medically to help Mr. Coutee improve. Because Global Marine failed to authorize an evaluation by a psychologist, Dr. Smith did not know whether any of Mr. Coutee's pain problems were psychologically related. Dr. Smith further explained that he often sends his pain patients for a psychological evaluation because not all of them react to pain in the same manner. In his work release status report, Dr. Smith recommended that Mr. Coutee return to

23

light-duty work with the ability to lift ten pounds on a frequent basis and twenty pounds at a maximum. The doctor testified that he is aware of the issue of symptom magnification and agreed that it could be done consciously or unconsciously. Consequently, he recommends a psychological evaluation. At no time during his treatment of Mr. Coutee did he document that he was magnifying his symptoms or that he lacked sincerity in his complaints of pain.

The next time Dr. Smith saw Mr. Coutee was when he examined him in connection with his application for a job with the Rapides Parish Police Jury to operate heavy equipment. He noted that Mr. Coutee had a back injury a year prior to the examination. He had the Fontana Center administer the National Institute of Occupational Safety and Health (NIOSH) lift test which revealed that Mr. Coutee could lift fifty pounds. Dr. Smith recommended that Mr. Coutee could work within the fifty-pound lifting limit. However, Dr. Smith cautioned that the NIOSH lift test tests only the amount that a person can lift on any particular day. The doctor agreed with the statement that it "does not determine [a] a person's ability to function." Dr. Smith further explained that the NIOSH lift test is "not a predictor of the future, but is a representation of the present." With respect to back problems, Dr. Smith agreed that a back condition is a dynamic condition that can change over time and that radicular pain can shift occasionally. Moreover, he admitted that back pain can come and go and be re-injured after a return to work.

Subsequent to reaching MMI under the care of Dr. Smith, Mr. Coutee worked for the Rapides Parish Police Jury and Allied Tires. He also continued evaluation and treatment of his back pain with Drs. Cobb and Garcia. The job descriptions of both the Police Jury job and the Allied Tires job stated that the work was very heavy labor. However, Mr. Coutee testified, without contradiction, that the

actual work he performed was not as provided by the descriptions. With respect to Allied Tires, he stated that he often had help when he was required to lift heavy objects. He performed duties in the medium to light-duty range. He also testified that he often worked in pain because he had to work to support his family. We find that Mr. Coutee was injured during the accident and has suffered with continuous back pain. Although he may have had degenerative back conditions, it does not appear from the record on appeal that those conditions became symptomatic until after his accident. It appears that his condition was aggravated by the accident. Therefore, we award Mr. Coutee $100,000.00 for pain and suffering.

### *Future Lost Earnings*

Since he was discharged from Dr. Smith's care, Mr. Coutee has worked in pain. His wages have been between $6.25 per hour to $7.50 per hour. Glenn Hebert, a vocational consultant, testified regarding Mr. Coutee's employment potential. An evaluation revealed that Mr. Coutee is unable to read or spell above the third grade level; he is illiterate. Thus, the type of employment available to him would be limited to jobs which require little or no reading and spelling. Margo Hoffman, a vocational rehabilitation expert, was called on behalf of Global Marine. She testified that because Mr. Coutee was able to perform work as a tire technician at Allied Tires, he would be able to work in a position as a roughneck. According to the description of the position of roughneck provided by Global Marine, Mr. Coutee would be required to lift 150 pounds frequently. This type of position is classified as very heavy labor. As noted elsewhere in this opinion, due to Mr. Coutee's back injury and pain, he is unable to perform jobs requiring very heavy labor. Furthermore, Ms. Hoffman did not speak with anyone at Allied Tires regarding the physical requirements of the job Mr. Coutee actually performed for Allied Tires. Her

opinion that he could engage in very heavy physical labor was based on a definition of a tire tech in the <u>Dictionary of Occupational Titles</u>, which classifies the tire tech position as very heavy labor. Upon the assumption that Mr. Coutee lifted twenty-five pounds frequently and fifty pounds occasionally with assistance, she admitted that the physical requirements of the Allied Tires job was much less than that required for the job as a roughneck. Ms. Hoffman further admitted that a job that required lifting up to 150 pounds would be considered a very, very heavy labor job. Mr. Coutee told Mr. Hebert that working at Allied Tires "was killing him" and that he had to "crawl out of bed every morning to go to work." In reaching her conclusion, Ms. Hoffman did not have that information.

Ms. Hoffman's opinion that Mr. Coutee could work as a delivery driver or courier is flawed. She assumed in his positions with the Rapides Parish Police Jury and Allied Tires that Mr. Coutee was required to do some type of reading. He was not. She did not talk with those employers in her investigation of Mr. Coutee's abilities. Ms. Hoffman discussed literacy programs that could help Mr. Coutee learn to read which would enable him to get employment in jobs that required reading and writing. However she failed to conduct any type of IQ tests to determine whether he had the ability to learn to read. She was also unaware that Mr. Coutee could not write his own address. Ms. Hoffman testified that Mr. Coutee could obtain a commercial driver's license (CDL) because he could orally take the test for that license. She admitted that he could not get the hazardous material endorsement because it cannot be administered orally. However, she also admitted that even if he could obtain his CDL, he could never go on a cross-country trip because he would need to raise his level of literacy to handle the bills of lading, directions and map reading.

26

Mr. Hebert testified that Mr. Coutee's past work has been heavy unskilled, a job that can be learned in less than thirty days, or semi-skilled, a job that would take less than a year to learn. He further opined that the employment available to Mr. Coutee would be extremely limited due to his literacy level. Mr. Hebert explained that "when you're doing heavy manual labor, you don't require literacy level. You use your back to do that job." He further explained that because of his back injury, the type of jobs he is able to do physically cannot be performed from an "intellectual standpoint." Thus, many light-to-medium duty, sedentary type jobs, such as a dispatcher, warehouse worker and convenience store clerk, require a certain level of literacy that Mr. Coutee does not possess.

Mr. Coutee's tax returns from the years, 1998, 1999, and 2001, were reviewed by Dr. George Randolph Rice, an expert in the field of economics. Mr. Coutee was born on May 13, 1969. At the date of trial, he was a little over thirty-four years old. Dr. Rice testified that based on Mr. Coutee's age, his work life expectancy is 25.63 years. Dr. Rice used Mr. Coutee's wage earnings of the year 2000, the last full calendar year prior to the accident, to calculate his past wage loss. He made the assumption that had Mr. Coutee been able to continue his work at Global Marine, he would have earned the same amount of money from 2001 through the date of trial. He also took into account the reduction due to payment of taxes as well as the fact that Mr. Coutee may have received raises as indicated in his previous tax returns. Dr. Rice concluded that Mr. Coutee's past, after-tax earnings loss was $100,284.00.

Dr. Rice also testified regarding Mr. Coutee's future lost wages. At the time of trial, Mr. Coutee was earning $7.50 per hour when he returned to work in early 2002 at Allied Tires, Little Eva Plantation and the Rapides Parish Police Jury. Dr. Rice opined that Mr. Coutee's work life indicates that he would, in the future,

27

receive raises beyond the cost of living increases as an employee. Dr. Rice concluded that the present value of earnings at $7.50 per hour for 25.63 years is $308,853.00, taking into account that he is now injured. Absent the injury, Dr. Rice testified that Mr. Coutee could have earned $872,027.00 over his work life expectancy. In reaching a final amount of future loss, Dr. Rice took the difference between the two above figures for a total of $563,174.00 in future lost earnings. Further, Dr. Rice's future loss of earnings amount assumes that Mr. Coutee would work forty hours per week, fifty-two weeks per year. Dr. Rice testified that if Mr. Coutee's employment was seasonal, his future loss of earnings figure would be higher.

On cross-examination, Dr. Rice admitted that he did not know about Mr. Coutee's work habits, his education, other than he had a high school diploma, and did not speak with his references or know whether Mr. Coutee would have maintained the same level of employment with Global Marine. He did take into account the amount that Mr. Coutee was earning at the time of trial, his past work record, his age at the time of trial, and his physical condition as revealed in his medical records.

Dr. Kenneth J. Boudreaux, an economist, was called by Global Marine to give an opinion regarding Mr. Coutee's loss of earning capacity and future earnings. Dr. Boudreaux testified that he examined Mr. Coutee's work life expectancy, his income base, a discount rate and increase rate as well as rehabilitation information to formulate his opinion regarding Mr. Coutee's loss of past and future wages. To obtain Mr. Coutee's income base, Dr. Boudreaux examined Mr. Coutee's earnings from 1994 through 2001, the last time he worked. He chose Mr. Coutee's earnings from 1997 through 2000 to average with a result of $36,864.71 per year as Mr. Coutee's income base. Unlike Dr. Rice, Dr. Boudreaux chose not to use the Bureau of Labor Statistics Work Life Expectancy table that was last published in

1986. He explained that the Bureau found it too expensive to publish that data. However, the Bureau published its methodology. Since then, other private companies have published reports on work life expectancy. One trend is that males now have a lower work life expectancy than females. Although he did not state what report he used to determine Mr. Coutee's work life expectancy, Dr. Boudreaux stated that he did calculations based on a white male with a high school diploma, aged 31.65 years old, the age he was at the date of the accident. Dr. Boudreaux concluded that Mr. Coutee had a work life expectancy of 27.96 years. Without a normal high school degree, Dr. Boudreaux opined that the Mr. Coutee's work life expectancy would be lower. Based on the assumption that Mr. Coutee could go back to work earning $9.56 per hour, Dr. Boudreaux opined that his past lost wages would be $34,274.00 adjusting for the $17,633.00 wage advance. Using the same figure, he calculated Mr. Coutee's future lost income to be between $212,000.00 and $311,000.00.

> Future loss of earnings is inherently speculative and must be proven with a reasonable degree of certainty; purely conjectural or uncertain future lost earnings will not be allowed. An award for loss of future earning capacity is not based merely upon the difference between the injured person's pre-accident wages and post-accident wages but rather it should be based on the difference between the injured person's earning capacity before and after the accident.
>
> In determining the proper amount to be awarded, the trier of fact should consider the injured person's age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation.

*Myers v. Broussard*, 96-1634, pp. 18-19 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, 98 (citations omitted).

At the time of the accident, Mr. Coutee was a healthy, thirty-one year old individual. Although he graduated from high school, he cannot read or spell above

the third grade level and cannot do math above the fifth grade level. Given his lack of literacy, his prospects of finding employment of a light-to-medium or sedentary duty are, for all practical purposes, highly unlikely. Mr. Coutee did demonstrate that he worked those types of jobs and was able to advance to jobs of greater responsibility in the offshore industry.

Essentially, the two economists who testified used different methodologies to calculate Mr. Coutee's loss of earning capacity as well as his past/future lost wages. Dr. Rice calculated Mr. Coutee to have a work life expectancy beyond trial of 25.63 years, loss of past wages of $100,284.00 and loss of future earnings of $563,174.00. Dr. Boudreaux calculated Mr. Coutee to have a work life expectancy beyond trial of 27.96 years, loss of past wages of $34,274.00 and loss of future earnings at between $212,000.00 and $311,000.00.

We find the loss of past wages in the amount of $60,000.00 and a loss of future earnings in the amount of $300,000.00 is supported by the evidence.

IV.

**CONCLUSION**

For the reasons assigned, the judgment appealed from is affirmed insofar as it holds that the SALA Block safety harness was not defective and that Delton Coutee was entitled to additional cure benefits in the amount of $1,885.11. The trial court's judgment is reversed and set aside insofar as it concluded that Global Marine Drilling Company was not negligent per se when it failed to install hand/guardrails on the platform from which Delton Coutee fell in violation of 33 C.F.R. § 143.110.

The trial court's judgment is reversed insofar as it concluded that settlement advances in the amount of $17,633.00 served as a set off to satisfy the $1,885.11 cure award. For the reasons assigned, this portion of the judgment is

30

amended to award Delton Coutee $1,885.11 in cure benefits since the settlement advances were wage payments and unrelated to Global Marine Drilling Company's obligation to provide cure. In connection with Delton Coutee's cure benefits, the trial court's judgment on the payment of attorney fees for Global Marine Drilling Company's callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent refusal to authorize examinations by doctors of Delton Coutee's choice as well as by order of its own physician, is reversed and we award attorney fees in the amount of $10,000.00. We affirm the trial court's judgment with respect to compensatory damages incurred as a result of Global Marine Drilling Company's failure to properly pay cure benefits because there was no evidence that Delton Coutee's injuries were exacerbated by Global Marine Drilling Company's failure to pay $1,885.11 in additional cure benefits.

We further award Delton Coutee: (1) general damages in the amount of $100,000.00; (2) past lost wages in the amount of $60,000.00; and (3) future lost earnings in the amount of $300,000.00. Costs of this appeal are assessed against Global Marine Drilling Company.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**