# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 08-1289


**JANELL ERNST**

**VERSUS**

**DR. FLYNN A. TAYLOR, ET AL.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. C-2004-0576
HONORABLE STUART S. KAY, JR., DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**BILLY HOWARD EZELL**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and
James T. Genovese, Judges.

**REVERSED AND RENDERED.**


**James R. Shelton**
**Durio, McGoffin, Stagg & Ackermann**
**P. O. Box 51308**
**Lafayette, LA 70505-1308**
**(337) 233-0300**
**Counsel for Defendants/Appellees:**
**St. Paul Fire & Marine Insurance Company**
**Dr. Flynn A. Taylor**

**Eugene A. Ledet, Jr.**
**Rivers, Beck, Dalrymple & Ledet**
**P. O. Drawer 12850**
**Alexandria, LA 71315-2850**
**(318) 445-6581**
**Counsel for Plaintiff/Appellant:**
**Janell Ernst**

**EZELL, JUDGE.**

Janell Ernst appeals a jury verdict which found that Dr. Flynn Taylor did not breach the standard of care in his treatment of her. She alleges that Dr. Taylor unnecessarily placed a cast on her left arm in an inordinately tight manner, causing a condition called reflex sympathetic dystrophy in her left arm. She also appeals rulings by the trial court which allowed testimony she claims should not have been admitted.

## FACTS

On January 6, 2001, Janelle Ernst fell in her driveway. She used her left hand to break her fall. The following day she went to Beauregard Memorial Hospital, complaining of pain in her left hand and wrist. X-rays of the left hand, wrist, shoulder, and elbow were taken. The x-ray of the left hand and wrist was interpreted as showing "no definite evidence of fracture, dislocation, osteomyelitis, arthritis or foreign body. There is no evidence of bony destruction or bony dysplasia. No soft tissue abnormalities noted." The x-rays of the left shoulder and elbow were also normal. Ms. Ernst was given pain medication and a splint with sling. She was told to keep her left wrist and arm elevated and apply ice. The emergency room doctor also told her to follow up with her family doctor in two days.

On January 10, 2001, Ms. Ernst was seen by Dr. Flynn Taylor, a family practitioner. Dr. Taylor took his own x-rays and diagnosed a hairline fracture in the distal radius of the left hand. At that time, he placed Ms. Ernst's left arm and hand in a cast. Dr. Taylor's records indicate that Ms. Ernst returned on January 24, 2001, and was complaining that the cast was tight at the thumb. He had the cast trimmed around the thumb. Ms. Ernst returned to see Dr. Taylor on February 6, 2001. His records do not indicate any problem with the cast. Ms. Ernst returned on February

1

15, 2001, complaining that the cast was becoming too tight around noon and causing pain. At this time the cast was removed. Ms. Ernst last saw Dr. Taylor on March 28, 2001. As of this visit, Ms. Ernst had been in physical therapy for three weeks. At each visit, Dr. Taylor would x-ray the left arm and noted that the fracture was healing.

At trial, Ms. Ernst testified that the cast felt tight the day it was put on. She stated that she told Dr. Taylor that her arm was in pain on each of the visits and that her fingers were swollen and blue.

Continuing to have problems, Ms. Ernst saw Dr. Frederic Wilson, an orthopedic surgeon, on February 21, 2001. Although Ms. Ernst indicated at trial that she still had her cast on, Dr. Wilson's records indicate she was in a splint which could be removed, allowing the hand and wrist to be examined. Dr. Wilson testified that she presented with left forearm stiffness and swelling involving mostly her hand and fingers. He took an x-ray and noted no evidence of an acute fracture. Dr. Wilson recommended she stop wearing the splint and start moving her wrist. Dr. Wilson referred her to a neurosurgeon, Dr. Erich Wolf. This was the only time Dr. Wilson saw Ms. Ernst.

Dr. Wolf saw Ms. Ernst on April 4, 2001. Although he did not testify, his office notes indicate that she had edema and erythema at her left distal forearm, wrist, hand, and finger. Dr. Wolf also noted swelling over the middle interphalangeal joints and that her skin was somewhat shiny. Dr. Wolf also observed that Ms. Ernst had a condition called allodynia, which is a "condition in which an ordinarily painless stimulus, once perceived, is experienced as being painful." 18 Taber's Cyclopedic Medical Dictionary 69 (1997).

Meanwhile, Ms. Ernst went to see Dr. Leland Winston, an orthopedic surgeon in Houston, on February 27, 2001. He also observed the swelling over the wrist and

2

hand. He prescribed physical therapy for Ms. Ernst.

Ms. Ernst began physical therapy at Beauregard Physical Therapy Clinic on March 5, 2001. On her last visit on May 18, 2001, Ms. Ernst was still complaining of pain.

Ms. Ernst was next evaluated by Dr. G.L. Hovnatanian, a general surgeon, on May 22, 2002. Her neurological exam was normal, but the skin turgor was abnormal, which, as explained by Dr. Hovnatanian, is a condition in which the skin and underlying tissue atrophy. Her fingernail beds were also a little shiny. He opined that she had dystrophic changes which were the result of a longstanding immobility. He recommended stellate ganglion blocks. After Ms. Ernst had the nerve blocks, she returned to see Dr. Hovnatanian on September 16, 2002. Ms. Ernst was still in pain, so he made an appointment for her to see Dr. Riad Haj Murad, a neurologist, who saw her on October 30, 2002.

On her first visit with Dr. Haj Murad, Ms. Ernst was complaining of discomfort in her left arm with a burning sensation and numbness. He ordered an MRI of the neck and EMG studies. Dr. Haj Murad's initial impression was that she had mild sympathetic reflex dystrophy. He explained that all of her symptoms were subjective, although she did have bilateral carpal tunnel. He also noted some ulnar neuropathy and cervical spondylosis which were not severe enough to cause all of her symptoms. X-rays of her arm on April 3, 2003, indicated mild degenerative disease at the wrist with a slight deformity of the distal radius which could have been related to an old fracture. Dr. Haj Murad continued to see Ms. Ernst through May 2003 and one time in 2005. An EMG on January 6, 2005, did not indicate any change.

A medical review panel opinion was rendered in this matter on May 5, 2005, with the following unanimous decision (emphasis in original): "**The evidence**

3

**supports the conclusion that the Defendant, Dr. Flynn A. Taylor, failed to comply with the appropriate standard of care as indicated herein, and the conduct complained of was a factor of resultant damages."**

In written reasons for the opinion, the three panel members stated that the Dr. Taylor placed the cast on in an inordinately tight fashion and should have removed the cast when Ms. Ernst complained it was too tight. They further opined that the placement of the cast and leaving it on for five weeks caused reflex sympathetic dystrophy (RSD).

Dr. Peter Milder, a family practitioner, who served on the medical review panel, explained that Dr. Taylor diagnosed a fracture that did not exist in Ms. Ernst's left arm. He testified that while it is appropriate to cast an arm that is fractured, there was no fracture to Ms. Ernst's wrist, and a cast should never have been applied. He opined that Dr. Taylor breached the standard of care because there was no fracture.

Dr. William Bernard, another family practitioner on the medical review panel, also testified that he could not see the fracture on the January 10, 2001 x-rays. He agreed that the panel members had a hard time reading Dr. Taylor's office records and thought that Dr. Taylor would have documented swelling if he noticed it but could not say what Dr. Taylor's note-taking practices were.

Ms. Ernst filed suit against Dr. Taylor and his medical malpractice insurer, St. Paul Fire and Marine Insurance Company, on July 8, 2004. She alleged that Dr. Taylor's breach of the standard of the care caused her to suffer with RSD in her left arm and asked for damages. Trial before a jury was held on April 8-11, 2008. While the jury found that Ms. Ernst established the applicable standard of care required of Dr. Taylor, it found that he did not breach that standard of care in his treatment of her.

4

Ms. Ernst appeals the jury's finding. She also complains about the trial court's admission of the testimony of two experts who testified for the defense. We will first address the issue of the admission of the expert testimony in order to determine if it was properly before the jury and should be considered in our review of the case.

## ADMISSION OF TESTIMONY

Initially, we address Ms. Ernst's arguments that the trial court erred in admitting the testimony of Dr. Dan Butler and Dr. José Ochoa. We will address each issue separately.

<u>Dr. Dan Butler</u>

Dr. Butler was an orthopedic doctor who treated Ms. Ernst in 2002. Ms. Ernst claims that he was allowed to testify about his treatment of her in violation of the health care provider-patient privilege found in La.Code Evid. art. 510 because Dr. Butler and defense counsel met in private without notice to her or her attorney. Defendants argue that La.Code Evid. art. 510 (F)(1) provides that there is no privilege related to factual matters pertaining to liability in medical malpractice claims. Defendants argue that defense counsel's meeting with Dr. Butler did not concern her current treatment or physical condition.

In *Coutee v. Global Marine Drilling Co.*, 04-1293 (La.App. 3 Cir. 2/16/05), 895 So.2d 631, *writ granted*, 05-756 (La. 5/13/05), 902 So.2d 1000, *writ reversed on other grounds*, 05-756 (La. 2/22/06), 924 So.2d 112, this court examined the health care provider-patient privilege found in Article 510. In that case, this court found that an exception existed to the physician-patient privilege because the plaintiff had put his physical condition at issue when he filed a Jones Act suit. The court cited La.Code Evid. art. 510 (E) and noted that the exception to the privilege would only apply through testimony at trial or by the use of proper discovery methods. This court

found that the information regarding the plaintiff's physical condition was not provided to the doctor through proper discovery methods, with notice of the contact given to the plaintiff's counsel. This court found that the privilege was breached and found that the trial court abused its discretion by admitting the testimony of the doctor because the violation tainted the integrity of the trial. *See also, Wood v. Am. Nat'l Prop. & Cas. Ins. Co.*, 07-1589 (La.App. 3 Cir. 12/23/08), 1 So.3d 764.

Louisiana Code of Evidence Article 510 (F) regarding the privilege in medical malpractice cases provides (emphasis supplied):

**F. Medical malpractice.** (1) There shall be no health care provider-patient privilege in medical malpractice claims as defined in R.S. 40:1299.41 et seq. as to information directly and specifically related to the factual issues pertaining to the liability of a health care provider who is a named party in a pending lawsuit or medical review panel proceeding.

(2) In medical malpractice claims information about a patient's current treatment or physical condition *may only be disclosed pursuant to testimony at trial, pursuant to one of the discovery methods authorized by Code of Civil Procedure Article 1421 et seq., pursuant to R.S. 40:1299.96 or R.S. 13:3715.1.*

Counsel for Dr. Taylor does not deny that he had ex parte communications with Dr. Butler. He admitted that he met with Dr. Butler to go over Ms. Ernst's medical records. They met for about an hour. Dr. Butler admitted he did not receive any medical authorization from Ms. Ernst or her attorney to discuss her treatment with anyone. In allowing Dr. Butler's testimony, the trial court held that the privilege had been waived because Dr. Butler was identified as a treating physician and medical records had been exchanged. We disagree and find that the privilege was breached.

Defendants argue that the privilege does not apply when the liability of a party named in a medical malpractice suit is at issue citing La.Code Evid. art. 510(F). They further claim that the use of proper discovery methods as mandated by La.Code Evid. art. 510(F)(2) does not apply in this case because Ms. Ernst's current treatment was

6

not discussed. Louisiana Code of Evidence Article 510 (F)(2) states that proper discovery procedures must be followed if information about a patient's "current treatment or physical condition" is sought. There is no doubt that counsel for defense and Dr. Butler discussed Ms. Ernst's physical condition. And while Dr. Butler may not have been treating Ms. Ernst at the time of trial, his treatment of her was discussed as defense counsel and Dr. Butler reviewed Ms. Ernst's medical records. Furthermore, on questioning Dr. Butler, defense counsel stated, "When you and I met, I told you all I wanted you to do was talk about your treatment of this patient; is that not true?" Dr. Butler confirmed that as an accurate statement.

Clearly, Ms. Ernst's current treatment and physical condition were discussed with Dr. Butler. As in *Coutee*, 895 So.2d 631, proper discovery methods were not followed, with notice given to Ms. Ernst's attorney as required by La.Code Evid. art. 510(F)(2). The privilege was breached. We now turn our attention to whether Dr. Butler's testimony tainted the integrity of the trial.

Although Dr. Butler's deposition had been taken in 2004, counsel for Dr. Taylor met with Dr. Butler the week before the trial. They went over Ms. Ernst's medical records, and at that time, Dr. Butler also reviewed Ms. Ernst's x-rays, giving his opinion on what he saw. As in *Coutee*, Dr. Butler was called by the defense to testify at trial relative to when he had been Ms. Ernst's treating physician. Dr. Butler's testimony, as compared to the other doctors, was very prejudicial to Ms. Ernst. He was the only doctor beside Dr. Taylor to see a hairline fracture on the x-ray. He also testified that the x-ray with the cast on indicated that there was enough air space between the arm and cast. Since Ms. Ernst's expert doctors testified by deposition, there was no time to get their opinion on this issue, especially since Ms. Ernst's attorney had no notice of the meeting and could not prepare. Dr. Butler saw

7

no indication of RSD. He further testified that he scheduled an appointment for Ms. Ernst with a psychologist, Dr. David Post. At the time of trial, Dr. Post had past away. Dr. Butler was allowed to testify that he called Dr. Post, and Dr. Post told him that Ms. Ernst had somatization disorder, which is a condition in which a person's depression is exhibited as a pain in a part of the body. There was never a report from Dr. Post indicating his findings. We find that Dr. Butler's testimony definitely had an effect on the information the jury received. The trial court abused its discretion by admitting the testimony of Dr. Butler.

While Dr. Butler did not specifically testify about the standard of care in this case, his testimony definitely had an impact on the standard of care issue. Having found that the trial court erred in admitting the testimony of Dr. Butler which affected the standard of care issue, the jury's determination that Dr. Taylor did not breach the standard of care is owed no deference, so we find it necessary to conduct a *de novo* review of the issues in this case; whether Dr. Taylor breached the standard of care, causation, and damages. *Andrus v. State Farm Mut. Auto. Ins. Co.*, 95-801 (La. 3/22/96), 670 So.2d 1206 (citing *Gonzales v. Xerox*, 320 So.2d 163 (La.1975)); *Galloway v. Baton Rouge Gen. Hosp.*, 602 So.2d 1003 (La.1992).

Dr. Jose' Ochoa

We now determine whether we should consider Dr. Ochoa's testimony in our *de novo* review of the case. Ms. Ernst claims that Dr. Ochoa's testimony is biased and scientifically unreliable.

Dr. Ochoa is a neurologist from Oregon who testified on behalf of Dr. Taylor as to his opinion about whether Ms. Ernst suffered with RSD. Ms. Ernst claims that Dr. Ochoa's testimony did not meet the criteria required for an expert to testify as found in La.Code Evid. art. 702. She also claims that he is biased toward the defense.

8

The trial court is granted broad discretion in determining who should or should not testify as an expert. *Cheairs v. State ex rel. Dep't. of Transp. and Dev.*, 03-680 (La. 12/3/03), 861 So.2d 536. It is within the trial court's discretion to decide if an expert is qualified and competent to testify in specialized areas, and its decision will not be overturned absent an abuse of discretion. *Id*.

Louisiana Code of Evidence Article 702 provides for the admission of expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

> Expert testimony, like any other form of evidence, must be relevant; it is subject to the La.Code Evid. art. 403 balance whereby its probative value is weighed against the "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." If its probative value is substantially outweighed by these factors, the otherwise relevant evidence is inadmissible.

*McPherson v. Lake Area Med. Ctr.*, 99-1876, p. 8 (La.App. 3 Cir. 5/24/00), 767 So.2d 102, 107, *writ denied*, 00-1928 (La. 9/29/00), 770 So.2d 353.

The following four-part inquiry should be used in evaluating whether expert testimony should be admitted:

> (1) whether the witness is qualified to express an expert opinion, (2) whether the facts upon which the expert relies are the same type as are relied upon by other experts in the field, (3) whether in reaching his conclusion the expert used well-founded methodology, and (4) assuming the expert's testimony passes these tests, whether the testimony's potential for unfair prejudice substantially outweighs its probative value under the relevant rules.

*Id*. (quoting *Adams v. Chevron, U.S.A., Inc.,* 589 So.2d 1219, 1223 (La.App. 4 Cir. 1991), writ denied, 592 So.2d 414, 415 (La.1992).

9

It is clear that Dr. Ochoa was called to testify that the diagnosis of RSD is no longer an accepted diagnosis in the medical community, and therefore, Ms. Ernst cannot be suffering with RSD. Dr. Ochoa admitted that he never examined Ms. Ernst. He only reviewed her medical records. Dr. Ochoa explained that since the 1990's the new nomenclature for RSD is complex regional pain syndrome I (CRPS I). CRPS II is a separate condition that exists when there is a definite nerve injury. He testified that CRPS I is a diagnosis when the patient complains of pain following an injury associated with moderate sensory phenomena. There might be changes in color and temperature. There is no nerve injury, and the cause is unknown. Dr. Ochoa testified that he had never diagnosed CRPS I because CRPS I is not a diagnosis.

There is no doubt that Dr. Ochoa is well-educated and trained. He obtained his medical degree in Chile where he was born and raised. He studied for eight years at the Institute of Neurology in London. He then came to Dartmouth Medical School in New Hampshire where he ran the nerve and muscle clinic for ten years. Dr. Ochoa then moved to the University of Wisconsin to teach neurology. He is presently at the Good Samaritan Hospital in Portland, Oregon, and associated with the Oregon Health & Science University. He has been in Oregon for twenty-one years. He has published about 150 peer-reviewed articles and chapters in books used in teaching. He now practices specialized neurology dealing with nerve disease, pain, abnormal sensation, and sympathetic dysfunction. However, Dr. Ochoa has not taken the neurology board certification examination and is not board certified in any field.

Dr. Ochoa's bias was called into question in the traversal of his qualifications. He has testified in hundreds of cases. Only two of the cases in which he testified in court were on behalf of the plaintiff. He admitted that most of his cases over the past fifteen years had been sent to him by the defense. Approximately ninety-five percent

10

of the cases dealt with RSD.

However, it was also clear from his testimony that he offered no basis or other scientific support for his conclusion that RSD was no longer a valid diagnosis other than his own testing and his testimony that there were many doctors who supported his conclusion. Dr. Ochoa did agree that there are physicians who disagree with the position he has taken regarding RSD. However, Dr. Ochoa testified that any physician who believed that RSD was a valid diagnosis was not a preeminent physician. Dr. Ochoa was also questioned about cases in other states in which the courts have acknowledged that Dr. Ochoa had a reputation as being hired to refute RSD claims. In regard to these questions, he opined that he had been slandered.

Dr. Ochoa could not offer any medical evidence, other than his own personal studies, for his theories that RSD was no longer a viable diagnosis. No studies by other doctors were offered in support of his conclusion that RSD is no longer a valid diagnosis. Dr. Ochoa admitted that there were many medical books that recognized that RSD, or CRPS, is a disabling condition. There was no evidence or testimony offered to indicate that Dr. Ochoa's conclusion is reliable or scientifically based. Therefore, we find that the trial court erred in not excluding Dr. Ochoa's testimony. Accordingly, in conducting our *de novo* review, we will not consider the testimonies of Drs. Butler or Ochoa.

**BREACH OF THE STANDARD OF CARE**

The burden of proof on a plaintiff in a medical malpractice case is found in La.R.S. 9:2794(A) which provides in pertinent part:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues

11

peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

There is no doubt that Dr. Taylor breached the standard of care in his treatment of Ms. Ernst. The evidence was overwhelming that a cast was placed on Ms. Ernst's left arm when she did not have a fracture. As stated in the facts, all the doctors agreed that there was no fracture on the January 10, 2001 x-ray, and a cast should have never been placed on Ms. Ernst. Dr. Michael Allen, a radiologist, testified he did not see evidence of a fracture on the January 2001 x-ray. Even Dr. Robert Rush, an occupational medicine specialist who formerly was in family practice, testified that he did not see anything on the January 10, 2001 x-ray that would be a fracture. He opined that Dr. Taylor over read the x-ray. Furthermore, Dr. Taylor continued to x-ray Ms. Ernst's arm at follow-up visits, noting a healing fracture, which again, the doctors who testified did not see.

## CAUSATION

The plaintiff in a medical malpractice case must show that it is more probable than not that her alleged injury was the result of the defendant physician's breach of the standard of care. *Gajewsky v. Ning*, 08-340 (La.App. 3 Cir. 10/1/08), 997 So.2d 567, *writ denied*, 08-2598 (La. 1/9/09), 998 So.2d 723. Ms. Ernst claims that the cast was too tight causing RSD in her left arm.

Ms. Ernst testified that the cast felt too tight the day it was put on. She also stated that as she wore the cast, her fingers continued to get more blue and swollen.

12

Ms. Ernst stated that she had no problem with her forearm before she fell. She now has severe pain all the time. Her left arm gets cold and then it gets hot, and it stays swollen.

During the three visits that Ms. Ernst saw Dr. Taylor while she was in a cast, his records indicate that she complained of tightness at two of them. Dr. Taylor testified that he would have noted if her fingers were blue and swollen. However, the three doctors that saw Ms. Ernst soon after her cast was removed noted swelling in her left arm and hand. Dr. Wilson testified that when he saw Ms. Ernst on February 21, 2001, after her cast had been removed, he noted swelling in her hand and fingers. Ms. Ernst was complaining of pain in her forearm. Dr. Winston saw Ms. Ernst on February 27, 2001, and he also noted swelling over her wrist and hand with some hypersensitivity. When Dr. Wolf saw Ms. Ernst on April 4, 2001, he also noted swelling and redness in her left forearm, wrist, hand, and fingers. Ms. Ernst complained that she had developed a progressively worse constant burning and aching pain in her left hand and wrist.

Dr. Hovnatanian testified that Ms. Ernst definitely had RSD. He also stated that a tight cast can cause RSD. This is why Dr. Hovnatanian referred Ms. Ernst to a neurologist, Dr. Haj Murad.

Dr. Haj Murad explained that RSD is an injury to the nerve from trauma. It is defined in 18 Taber's Cyclopedic Medical Dictionary 1651 (1997), as "[a]n excessive or abnormal response of the sympathetic nervous system following injury to the face, shoulder, or extremity." Dr. Haj Murad testified that RSD is manifested by a burning and tingling sensation, weakness, discoloration of the skin, sweating of the skin, and an increased sensitivity to sensory stimuli. He testified that there really isn't a good understanding of what causes it, and other possible causes are ruled out before a

13

person is diagnosed with RSD. Dr. Haj Murad explained that most RSD diagnoses are based on subjective complaints unless they are advanced cases. He opined that Ms. Ernst had mild to moderate RSD. Dr. Haj Murad also testified that he believed that trauma was the most common cause of RSD but that compression can cause ischemia to the nerve. While an EMG study on May 23, 2001, indicated that the testing of the left ulnar nerve was normal, EMG studies performed on October 30, 2002, March 6, 2003, and January 6, 2005, indicated that there is mild left ulnar neuropathy. It was Dr. Haj Murad's opinion that a compression injury caused by an over-tight cast caused an injury in the forearm to the ulnar nerve. Dr. Haj Murad further testified that this condition would remain for a while.

Dr. Wolf's report indicates that he diagnosed Ms. Ernst with CRPS to the left upper extremity. However, there is no indication as to the cause, and he never saw Ms. Ernst after the one visit. All of the medical review panel members opined that a tight cast caused Ms. Ernst to suffer with RSD.

Following removal of the cast, the doctors who examined Ms. Ernst observed swelling in the left arm and noted Ms. Ernst's complaints of pain. She has continued to suffer with pain after removal of the cast. While trauma, such as Ms. Ernst's fall on her wrist, can be a cause of RSD, the doctors opined that it was a tight cast that caused the RSD. Dr. Taylor's own records indicate that there were complaints of cast tightness on two of the three office visits. No doctor thought Ms. Ernst was malingering. We find that the evidence established that it is more probable than not that Ms. Ernst suffers from RSD caused by a cast placed too tightly on her arm by Dr. Taylor.

14

## DAMAGES

At trial the parties stipulated that Ms. Ernst had incurred $14,522.00 in medical expenses. Therefore, we find that Ms. Ernst is entitled to an award of $14,522.00 in special damages for past medical expenses. There was no evidence or testimony regarding any future medical care Ms. Ernst might need.

Ms. Ernst also claims she is entitled to an award of general damages. "General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty." *Miller v. LAMMICO*, 07-1352, p.2 (La. 1/16/08), 973 So.2d 693, 711. General damages can include an award for mental or physical pain and suffering and loss of enjoyment of life. *Id.*; *Williams v. Enriquez*, 41,200 (La.App. 2 Cir. 6/28/06), 935 So.2d 269. "In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we should affirm. Instead, we set the award in an amount which is just compensation for damages revealed by record." *Broussard v. Med. Protective Co.*, 06-331, p.5 (La.App. 3 Cir. 2/21/07), 952 So.2d 813, 818 (quoting *Gordon v. Willis Knighton Med. Ctr.*, 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, 999, *writs denied*, 95-2776, 95-2783, (La. 1/26/96), 666 So.2d 679).

At the time of trial, Ms. Ernst was seventy-three years old. She continues to suffer with RSD since her treatment with Dr. Taylor seven years prior to trial in 2001. Dr. Haj Murad opined that Ms. Ernst's condition is a mild to moderate case. Dr. Haj Murad testified that Ms. Ernst was depressed because she was not able to use her arm.

Ms. Ernst testified that she cannot do any of her hobbies anymore. It is hard, if not impossible, for her to lift heavy pots. She cannot do mopping and sweeping, although she does vacuum a little. Ms. Ernst testified that she has been very depressed and that she suffers with pain every day. Ms. Ernst was able to take a

15

month-long trip in 2002 to Bangkok. She testified that she brought a lot of pain pills with her. Based on the testimony and evidence, we find that $75,000.00 is an appropriate award of general damages.

## DECREE

For the reasons expressed in this opinion, we reverse the jury's finding that Janell Ernst did not prove that Dr. Flynn Taylor breached the standard of care he owed to her in his treatment of her. We find that Dr. Taylor breached the standard of care owed to Ms. Ernst and that said breach caused Ms. Ernst to suffer with RSD of her left arm. Therefore, we render judgment in favor of Janell Ernst and against Dr. Flynn Taylor and his insurer, St. Paul Fire and Marine Insurance Company, as follows:

IT IS ORDERED, ADJUDGED, AND DECREED that the judgment of the trial court pursuant to jury verdict is reversed and set aside and that there be judgment herein in favor of Janell Ernst and against Dr. Flynn Taylor and St. Paul Fire and Marine Insurance Company in the amount of EIGHTY-NINE THOUSAND FIVE HUNDRED TWENTY TWO AND 00/100 ($89,522.00) DOLLARS, together with legal interest from the date of the filing of the complaint until paid as per La.R.S. 40:1299.47(M),[1] and for all costs of trial and these appellate proceedings.

**REVERSED AND RENDERED.**

---

[1] Louisiana Revised Statutes 40:1299.47(M) provides that "[l]egal interest shall accrue from the date of filing of the complaint with the board on a judgment rendered by a court in a suit for medical malpractice brought after compliance with this Part."

16